**FMC CORPORATION,**
**Plaintiff–Appellant,**

**v.**

**Ivan F. BOESKY, et al.,**
**Defendants–Appellees.**

No. 87–1678.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 12, 1987.

Decided July 21, 1988.

Thomas P. Sullivan, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

William E. Willis, Sullivan & Cromwell, New York City, Charles E. Davidow, Wilmer, Cutler & Pickering, Washington, D.C., for defendants-appellees.

Before BAUER, Chief Judge, and RIPPLE and MANION, Circuit Judges.

BAUER, Chief Judge.

On November 14, 1986, Ivan F. Boesky passed quickly from fame to infamy. That afternoon, after the markets closed, federal officials announced that the Securities and Exchange Commission ("SEC") had

charged Boesky with violating the securities laws by trading in the stock of at least seven corporations with the benefit of material nonpublic information. The officials also announced that Boesky had entered into a responsive "Consent and Undertakings," in which he agreed to abide by the terms of a permanent injunction, plead guilty to one criminal count, and pay a $50 million fine and an additional $50 million representing disgorgement of some of the profits from illegal trades in the seven corporations' stock.[1]

FMC Corporation ("FMC") is one of those corporations, and this civil action for damages, filed on December 18, 1986, is one of the first to follow the SEC's charges. FMC's complaint alleges that Boesky, with the help of other defendants, wrongfully misappropriated confidential business information concerning FMC's May, 1986 recapitalization, and then used that information to manipulate the price of FMC's stock. In sixteen counts, FMC alleges that some or all of the defendants violated several federal securities laws, all four civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and various state common laws. FMC claims that, because of Boesky's illegal conduct, it altered the terms of its initial recapitalization proposal and, as a result, paid approximately $235 million more to recapitalize than it otherwise would have. FMC also alleges that Boesky lined his pockets with more than $20 million by trading illegally in FMC's stock.

The district court dismissed FMC's action, holding first that the complaint alleges no legally cognizable injury and, therefore, that FMC lacks constitutional standing to assert its federal-law claims. The court then declined to exercise pendent jurisdiction over FMC's state-law claims. FMC appeals from the district court's dismissal of its complaint.

## I.

Plaintiff-appellant FMC, a Delaware corporation with its principal place of business in Chicago, produces machinery and chemicals for industry, government, and agriculture. A large corporation—in 1985, its sales exceeded $3.26 billion—its common stock is traded on the New York Stock Exchange ("NYSE") and on other major exchanges. Before its May, 1986 recapitalization, eighty percent of FMC's twenty-two million common shares were publicly owned.

In addition to Boesky, a former securities arbitrager, the defendants-appellees include the various entities through which Boesky conducted his investment activities ("the Boesky Affiliated Entities" or "the Boesky Group")[2]; David S. Brown, an officer of the investment banking firm of defendant Goldman, Sachs & Co. ("Goldman"); Ira B. Sokolow, an officer of the investment banking firm of defendant Shearson Lehman Brothers, Inc. ("Shearson"); and Dennis B. Levine, an officer of the investment banking firm of defendant Drexel Burnham Lambert, Inc. ("Drexel").

## II.

The complaint tells the following tale.[3]

---

1. See Wall Street Journal, Nov. 17, 1986, at 1, col. 1 (midwest ed.). Boesky neither admitted nor denied the SEC's insider trading charges in the settlement agreement. On April 23, 1987, however, one week after the district court dismissed this action, he pled guilty in the United States District Court for the Southern District of New York to a one-count criminal information. Boesky admitted that he misrepresented his ownership of common stock of Fischbach Corporation by filing a false Schedule 13D with the SEC. In December, 1987, Judge Lasker sentenced Boesky to three years imprisonment. United States v. Boesky, 674 F.Supp. 1128 (S.D. N.Y.1987).

2. The Boesky affiliated entities are: Boesky & Kinder Partners, L.P.; Ivan F. Boesky & Company, L.P.; IFB Managing Partnership, L.P.; Cambrian & General Securities, p.l.c.; Beverly Hills Hotel Corporation; Farnsworth and Hastings Limited; Northview Corporation; Seemala Partners, L.P.; Seemala Corporation; and Ivan F. Boesky Corporation.

3. Because FMC appeals from the district court's dismissal on the pleadings, we take as true all well-pleaded factual allegations of the complaint together with all reasonable inferences therefrom. Coates v. Illinois State Bd. of Educ., 559 F.2d 445, 447 (7th Cir.1977).

Sometime before early 1985, Boesky, Levine, Sokolow, and Brown agreed to share confidential business information about impending corporate transactions for their individual and collective financial benefit. For example, Boesky agreed to pay Levine five percent of any profits Boesky made trading with the benefit of material nonpublic information provided by Levine. As high-ranking officers of influential Wall Street investment banking firms, each had access to such confidential business information and, as we shall see, Boesky had the ability to turn that information into profits.

In early 1985, after Boesky and friends formed their illicit trading pact, FMC's management was considering antitakeover measures. FMC hired Goldman to help consider various options, including acquisitions, a leveraged buyout, and a recapitalization. After studying FMC's corporate structure and the growth nature of its principal businesses, FMC and Goldman determined that a recapitalization was FMC's best alternative.[4]

A recapitalization would help shield FMC from a hostile takeover by enabling FMC's management to increase significantly its proportionate equity interest in the corporation and, at the same time, substitute a substantial amount of debt for equity in the company's capital structure. In short, FMC would buy each share of its common stock from public shareholders for cash plus one share of new common stock; management, on the other hand, would purchase its old common shares entirely with new stock. By accepting new equity instead of a partial cash payment for its old shares, management would increase its ownership stake in the company. Coupled with an amendment to FMC's charter requiring a supermajority to authorize certain business combinations, management would have much greater control of the corporation's destiny. In addition, by borrowing to finance the cash payment to public shareholders, the company would inject approximately $2 billion worth of debt into its capital structure. This debt infusion would make the corporation less attractive to a hostile bidder.

After deciding to recapitalize, FMC retained Goldman to help it consummate the transaction. Under the parties' written retainer agreement, Goldman agreed to keep confidential FMC's recapitalization plans and all information disclosed by FMC in connection with it. Goldman promised to disclose information about "Project Chicago," as the recapitalization was called, only to its agents, employees, and counsel who needed to know the information. In return for Goldman's services, FMC agreed to pay Goldman $17.5 million if and only if the recapitalization was consummated. With that sum as an incentive, Goldman began working on the terms of the recapitalization.

In early 1986, Goldman's Brown, although he was not a member of the Goldman "team" working with FMC, learned of "Project Chicago." More faithful to the illegal-trading foursome's agreement than to his employer, Brown passed the confidential information concerning FMC's consideration of a recapitalization to Sokolow, who passed it to Levine, who passed it to Boesky. Each knew that the disclosure of the information constituted a breach of Goldman's and Brown's contractual and fiduciary duty to FMC, and that it constituted a misappropriation and wrongful taking from FMC. Apparently, this troubled them little, especially Boesky.

With the benefit of the confidential information obtained from Brown through Sokolow and Levine, Boesky, through the Boesky Affiliated Entities, began purchasing FMC's common stock. Lots of it. Between Tuesday, February 18, 1986, and Friday, February 21, 1986, the Boesky Group bought at least 95,300 shares. During the

---

4. A recapitalization can be a powerful antitakeover measure for mature, slow-growth companies. *See* Lederman & Goroff, Recapitalization Transactions, 19 Rev. of Sec. & Commodities Reg. 241, 242 (Nov. 19, 1986). "Such companies often find themselves acquisition targets in the current takeover environment, primarily because they generate large amounts of cash without having adequate opportunities to reinvest such cash or make acquisitions, and are unwilling to undertake extensive stock repurchase programs." *Id.*

first three days of this period, the Boesky Group's purchases accounted for roughly thirteen percent of the total volume of trading in FMC stock on the NYSE. Within this three-day span, FMC's stock price rose from $71.75 to $80.75 per share.

On the morning of February 21, 1986, FMC's stock price climbed to $83. At that point, FMC asked the NYSE to suspend trading in its stock and the company announced publicly that it was contemplating a recapitalization. Following the announcement, trading in FMC stock resumed and the price rose to $85.625 per share. That Friday, the Boesky Group began selling its 95,300 shares. The alleged profits: at least $975,000.

That same Friday, February 21, 1986, Goldman outlined the terms of the recapitalization for FMC's board and opined that the proposed transaction was fair to shareholders. Under the proposal, FMC would purchase each share of its old common stock from public shareholders for $70 cash and one share of new FMC stock. Management would receive no cash, just 5.667 shares of new FMC stock for each old share. FMC's Thrift Plan, a type of employee profit-sharing plan, would receive $25 in cash and four shares of new FMC stock for each old share.

Crucial to Goldman's opinion that the proposed recapitalization was fair to all shareholders was its estimate that each share of new FMC stock would be worth $15.00. Based on that estimate, each shareholder group would receive $85 worth of consideration for each old common share. If the $15 estimate was inaccurate, however, there would not be parity of consideration among the three shareholder categories. The $85 in consideration, of course, was roughly equal to the price at which FMC's stock was trading on Friday,

February 21, 1986. Thus, on Saturday, February 22, 1986, FMC's board of directors approved the proposed recapitalization and, for the first time, announced the deal's terms to the public.[5]

After FMC's board approved the recapitalization proposal, the price of old FMC stock rose substantially above $85 per share, enough so that Goldman became concerned that its initial estimate that new FMC stock would be worth $15 per share was no longer accurate and, as a result, that the proposed recapitalization was no longer fair to public shareholders.[6] Goldman thus urged FMC to increase the cash payment going to public shareholders for their old common shares under the proposed plan, and FMC began considering its options.

Unknown to FMC, Boesky learned that FMC was reviewing the cash portion of the consideration for public shareholders' old stock[7] and, with the benefit of this information, began purchasing a substantial amount of old FMC stock. Between March 12, 1986, and April 4, 1986, the Boesky Group purchased at least 1,922,000 shares of old FMC stock at prices generally between $87 and $90 per share. These purchases accounted for more than fifty percent of the total volume of trading in FMC stock on the NYSE during that period. FMC alleges that the Boesky Group's illegal trading caused the price of old FMC stock to rise sharply and to remain at an artificial and distorted level. Boesky, FMC alleges, wanted to "force" FMC to increase the cash portion of the consideration for public shareholders' old stock, which would mean more profits for Boesky.

On April 25, 1986, FMC's stock price climbed to $97 per share. At that time, Goldman informed FMC that it would with-

---

**5.** On that same day, FMC shareholders filed three separate class actions against FMC and its directors in Delaware Chancery Court. The complaints alleged, *inter alia,* that the $70 cash payment was unfair to the public shareholders.

**6.** In other words, because management was receiving only new equity and no cash for its old shares, management's consideration for each old share would exceed that received by public

shareholders under the plan if new FMC stock were worth more than $15 per share.

**7.** The complaint does not identify the "tipper" of this information, although FMC in its brief argues that Brown misappropriated and leaked the information in the same fashion as he did during FMC's initial consideration of the recapitalization.

draw its February 21 fairness opinion unless FMC increased the cash payment for public shareholders or decreased the number of shares of new FMC stock that management would receive for its old shares.[8] The latter alternative, however, would mean that public shareholders would lose certain of the transaction's tax benefits.[9] Thus, on April 26, 1986, FMC announced publicly that it was increasing the cash portion of the consideration for public shareholders' old shares from $70 to $80.[10]

The ten-dollar increase in the cash payment to public shareholders was based upon Goldman's revised estimate that each share of new FMC stock would be worth $17.14. Thus, under the new recapitalization terms, each category of FMC shareholders would receive consideration worth $97.14 for each share of old FMC stock, which was roughly equal to the shares' market value during the week of April 26, 1986. Because public shareholders owned approximately twenty-two million shares of old FMC stock, the $10 increase in the cash portion of the deal meant that FMC would need an additional $220 million in funds to consummate the recapitalization.

Boesky's alleged wish thus granted, the Boesky Group began selling all of its old FMC stock at about $99 per share beginning Monday, April 28, 1986, the first day of trading after FMC announced the increase in the cash portion of the deal. The alleged profits: approximately $20 million.

On May 22, 1986, FMC's shareholders approved the revised recapitalization proposal. The shareholders also approved an amendment to FMC's charter requiring a super-majority to authorize certain business combinations. Six days later, on May 28, 1986, FMC executed the recapitalization and began purchasing all of its old common stock. That same day, trading in new FMC stock on the NYSE began on a when-issued basis. As a result of the recapitalization, the proportionate equity interest of public shareholders in FMC decreased from just over eighty percent to just under sixty percent. Equity holdings in the hands of management and the Thrift Plan increased from just under twenty percent to just over forty percent. The recapitalization increased FMC's debt burden by about $2 billion.[11]

As for the illegal trading ring, all four of its members, Boesky, Levine, Sokolow, and Brown, were either indicted by the federal government or sued by the SEC. The SEC's charges against Boesky generated this civil action.

### III.

The foundation of FMC's complaint is the defendants' "wrongful misappropriation and misuse of [FMC's] confidential business information, and [the defendants'] manipulation relating to the purchase and sale of FMC's securities." FMC alleges that some or all of the defendants violated the

---

8. Although Goldman at the time apparently emphasized only these two options, as does FMC on appeal, all the defendants now point out that FMC did have a third option: it could have chosen to abandon the recapitalization.

9. Under then-existing tax law, if the public shareholders' proportionate equity interest in the company decreased by twenty percent or more, the cash payment received by those shareholders would qualify as a "disproportionate redemption," and would be taxed as a capital gain rather than as a dividend. *See* Lederman & Goroff, *supra*, note 4, at 242 n. 3.

10. FMC also announced that it was increasing the number of shares of new FMC stock to be issued to the Thrift Plan from 4 shares to 4.209 shares.

11. FMC's Board, however, had urged that the increased debt would benefit stockholders in recommending that they vote for the recapitalization proposal:

> The recapitalization is being effected at the present time because the Board of Directors believes that the Company's business can support substantially more indebtedness than is presently outstanding, which increase in indebtedness is intended to result in a higher return on equity to the stockholders, to take advantage of currently prevailing interest rates and the availability of financing at such rates and because of the avenue of attractive alternative uses for the Company's capital resources.

In addition, as already noted, increased debt would reduce the attractiveness of the company in the eyes of potential hostile acquirers.

federal securities laws,[12] RICO's civil provisions,[13] and state common laws,[14] and that, because of this illegal conduct, it suffered damages of more than $235 million. This sum apparently includes the additional $220 million FMC paid to public shareholders under the revised recapitalization proposal, and the additional attorneys' and directors' fees FMC incurred in revising and ultimately consummating the recapitalization. FMC alleges it would not have paid any of these costs absent the defendants' illegal conduct. In addition, FMC claims that it is entitled to recover Boesky's $20 million in profits, and the $17.5 million contract fee it paid to Goldman pursuant to the parties' retainer agreement.

In the district court, the defendants moved to dismiss FMC's complaint on a number of grounds. The court, however, confined the parties' initial round of briefing to the question whether FMC has standing to sue. In the ensuing debate, the parties and, ultimately, the district court, focused primarily on FMC's largest damage claim: the $220 million "increased cost" it allegedly incurred when it was "forced" to increase the cash payment public shareholders received under the revised recapitalization proposal. The central question in the litigation became whether this $220 million payment to the public shareholders injured FMC for purposes of establishing Article III or constitutional standing.

The district court held that it did not. Finding that the recapitalization was essentially "a distribution of part of FMC's assets to the owners of those assets in exchange for their giving up a part of their equity interest to management," *FMC Corp. v. Boesky*, 673 F.Supp. 242, 250 (N.D.Ill.1987), the court characterized the transaction "essentially as an instance of self-dealing, the movement of assets between the owners of those assets." *Id.* The court then went on to adopt the principle, derived from corporate mismanagement cases, that "where the shareholders decide to distribute to themselves the assets of the corporation on a pro rata basis, absent an erosion of the asset base in such a manner as to impinge upon the rights of creditors, no one has been harmed, so the corporation has suffered no injury." *Id.* at 250–51.

But this did not end the matter. Even though the court found that FMC was not injured by the $220 million payment to itself, the court still was not satisfied that it had solved completely the question whether Boesky's illegal conduct injured FMC. *Id.* at 251. The court thus looked to "the principles which underlie the prohibition on insider trading" to determine "that FMC was not injured by Boesky in a way covered by the insider trading rules." *Id.* According to the district court, FMC's

12. Counts I through V charge violations of federal securities laws. All of these counts, except Count IV, are brought against all defendants. Count I is brought under section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder. This count alleges that defendants either singly, by aiding and abetting, or by conspiring, made untrue statements of material fact and omitted to state material facts in connection with the purchase and sale of FMC stock. Count II alleges that defendants' misconduct was in connection with a tender offer and therefore violated section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e), and its attendant Rule 14e–3. Count III alleges market manipulation in violation of section 9(a) of the Exchange Act, 15 U.S.C. § 78i(a). Count IV is brought under section 18(a) of the Exchange Act, 15 U.S.C. § 78r(a), and charges that Boesky and the Affiliated Entities made false and misleading statements in the Schedule 13D. FMC claims it relied upon these

statements in executing its recapitalization. Finally, in Count V, FMC alleges that the same conduct that violated Rule 10b–5 violated section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

13. Counts VI through VIII are the RICO counts. Count VI is against defendants Boesky, Brown, Sokolow, Levine and the Affiliated Entities, and claims that those defendants violated sections 1962(a) and (d) of RICO, 18 U.S.C. §§ 1962(a), (d). Count VII alleges that all defendants violated sections 1962(c) and (d), 18 U.S.C. §§ 1962(c), (d); and Count VIII charges all defendants with offending sections 1962(b), (c) and (d), 18 U.S.C. §§ 1962(b), (c), (d).

14. The remaining counts allege various common law violations, including fraud by all defendants and negligence by Goldman, Shearson, and Drexel (because their employees leaked confidential information to Boesky).

injury did not stem from any trading Boesky did while he was in possession of confidential information superior to that possessed by FMC, for FMC knew as much about its recapitalization plan as Boesky knew. FMC contends that it did not know that Boesky possessed inside information and that it was deceived. But no facts in the complaint link Boesky's mere possession of this information to management's decision to increase the cash portion of the deal. There are perhaps investors who were injured by Boesky in the manner encompassed by the insider trading prohibition. Thus, those who sold their shares to Boesky may have a cause of action against him. However, FMC was not such an investor. *Id.* (citation omitted). Bolstered by its determination that FMC was not injured in a way covered by federal insider trading prohibitions, the court was more comfortable with its finding that FMC was not injured when it essentially paid the $220 million "increased cost" to itself. The court thus held that FMC's complaint alleges no legally cognizable injury and dismissed FMC's federal claims expressly for lack of Article III standing. The court then declined to exercise pendent jurisdiction over FMC's state-law claims. *Id.* at 252.

## IV.

■ The issue on appeal, then, is a narrow one: whether FMC has constitutional standing to assert its claims in federal court. Remarkably, none of the parties on appeal has devoted much attention to constitutional standing case law or doctrine. Nor did the district court review constitutional standing law in its opinion below. A brief review is in order.

### A.

Stated broadly,
the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both *constitutional* limitations on federal-court jurisdiction and *prudential* limitations on its exercise.... In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society.

*Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citations omitted) (emphasis supplied). The constitutional, or threshold, dimension of standing is the basic question of justiciability: "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Article III." *Id.* It is this question that the district court answered in the negative. Prudential, or nonconstitutional, standing limitations, on the other hand, are "essentially matters of judicial self-governance" designed by courts to avoid abstract questions of wide public significance that are better left to other governmental institutions for resolution. *Id.* at 499–500, 95 S.Ct. at 2205–06.

Thus, the first step in the standing inquiry is to determine whether a plaintiff has constitutional standing to sue in federal court. To do so, the plaintiff must allege "[1] a personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Although these three elements-injury, traceability, and redressability—involve concepts "not susceptible of precise definition," *id.* at 751, 104 S.Ct. at 3324, the case law provides some guidelines for their application. For example, the alleged injury must be " 'distinct and palpable,' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475–76, 102 S.Ct. 752, 760–61, 70 L.Ed.2d 700 (1982) (quoting *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)), as opposed to " 'abstract,' " " 'conjectural,' " or " 'hypothetical,' " *id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1664–65, 75 L.Ed.2d 675 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)), yet need not be direct, *Warth*, 422 U.S. at 504–05, 95 S.Ct. at 2208, nor economic in nature, *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct.

1361, 1366, 31 L.Ed.2d 636 (1972), *see also United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973). Unfortunately, these guidelines often are as amorphous as the imprecise elements themselves. The absence of precise definitions, however, should

> hardly leave [us] at sea in applying the law of standing. Like most legal notions, the standing concepts have gained considerable definition from developing case law. In many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases. More important, the law of Art. III standing is built on a single basic idea—the idea of separation of powers. It is this fact which makes possible the gradual clarification of the law through judicial application.

*Allen v. Wright*, 468 U.S. at 752, 104 S.Ct. at 3325.[15]

The next step of the standing inquiry is to determine whether the plaintiff's claims run afoul of any of the federal judiciary's prudential standing limitations, most commonly articulated in three general principles. First, if the plaintiff's asserted harm is a "generalized grievance" shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction. *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205. Second, the plaintiff generally must assert her own legal rights and interests; she cannot rest her claim to relief on the legal rights or interests of third parties. *Id.* Finally, the plaintiff's complaint must fall within the "zone of interests" to be protected or regulated by the statute or constitu-

tional guarantee in question. *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Assoc. of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)). This latter limitation might be referred to as a "statutory" standing limitation in that the particular federal statute the plaintiff seeks to invoke must afford the plaintiff a right to relief.

### B.

The distinction between prudential and constitutional standing limitations is important. As the Supreme Court has noted,

> satisfaction of the [prudential limitations] cannot substitute for a demonstration of "distinct and palpable injury ... that is likely to be redressed if the requested relief is granted."

*Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760. The reverse also is true. That a complaint has satisfied Article III's case or controversy requirement does not necessarily mean that the plaintiff can overcome the prudential standing hurdles. A plaintiff may allege a distinct and palpable injury fairly traceable to the defendant's putatively illegal conduct and redressable by the requested relief, but her claim still may fall outside the zone of interests protected by the statute she seeks to invoke. In such a case, the plaintiff has alleged an injury for purposes of Article III, but has not alleged a cause of action. Thus, the constitutional and prudential dimensions of standing must be kept separate; when the two are fused, standing law becomes confused.

### C.

It is noteworthy that the principal concern of standing law recognized by the

---

**15.** It may not, though. In the recent D.C. Circuit opinion in *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 798 (D.C. Cir.1987), the separation-of-powers principle may have generated more confusion than clarity. There, the three-judge D.C. Circuit panel generated three separate opinions, each with a varying interpretation of the causation aspect of constitutional standing as applied to the facts presented for review. Compare Judge Bork's view that the separation-of-powers concept may lead to a de-

nial of standing on the causation element of Article III's standing requirements where it otherwise might be found if it were a purely factual question, 809 F.2d at 803, 807, with the views of Judge Buckley, who found an alternative analysis of causation more readily inferred from Supreme Court precedent, *id.* at 816 (Buckley, J. concurring), and Judge Edwards, who flat out rejected Judge Bork's view, *id.* at 827 (Edwards, J., concurring in part, dissenting in part).

Court in *Wright*—separation of powers—is not implicated in this case. The separation of powers idea, of course, comes into play when a litigant challenges an act of the legislative or executive branch. *See Valley Forge*, 454 U.S. at 473, 102 S.Ct. at 759. Courts in such cases, out of proper regard for the structure of our constitutional system, refrain from passing upon the constitutionality of the challenged act unless the challenging party's interest in the outcome entitles that party to a decision. *Id.* at 474, 102 S.Ct. at 759. Indeed, most of the Supreme Court's Article III standing cases involve challenges to government conduct and, for that very reason, few allegations in prior standing cases are comparable to those in FMC's complaint. We find this telling, for, under *Wright*, a lack of separation-of-powers concerns implies limited constitutional standing concerns. The dispute still must be proper for judicial resolution, with the issues presented "not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action," *id.* at 472, 102 S.Ct. at 758. But this is hardly a concern of separation-of-powers magnitude.

It also is noteworthy that the district court fused the constitutional and prudential dimensions of the standing inquiry in reaching its holding that FMC lacked constitutional standing to assert its federal-law claims. As noted, the district court first characterized FMC's recapitalization "essentially as an instance of self-dealing" and determined that, because the shareholders of a corporation are the beneficial owners of its assets, the corporation paid the $220 million "increased cost" of the revised recapitalization to itself. Because FMC paid itself the money, the court reasoned, the company was not injured by the payment for purposes of Article III. But, as the court acknowledged, the determination that FMC did not harm itself by paying itself money did not solve completely the question whether *Boesky's* putatively

illegal conduct injured FMC. The court, therefore, went on to determine that FMC was not injured by Boesky *in a way covered by the insider trading rules* before dismissing the complaint for lack of constitutional standing.[16]

At that point, the district court erred by leaving the constitutional dimension of the standing inquiry to consider the prudential or statutory limitation of whether FMC's claim was encompassed by the federal securities laws it sought to invoke. By doing so, the court never determined completely whether FMC was injured for purposes of Article III. Put another way, that FMC was not injured in a way covered by certain securities laws does not mean it was not injured *at all.* As already noted, it is possible to allege an injury that satisfies the first element of Article III's case or controversy requirement, yet fails to fall within the zone of interests protected by a specific federal statute. In sum, the district court incorrectly used the *prudential* "zone of interests" standing limitation to reach its conclusion that FMC lacked *constitutional* standing to assert its claims. Absent the court's determination that FMC was not injured in a way covered by the insider trading rules, we are left with the court's initial acknowledgement that it had not solved completely the question whether FMC was injured by Boesky's putatively illegal conduct for purposes of Article III. We now turn to that question.

## V.

On appeal, the parties again have attempted to focus the Article III-injury inquiry on FMC's specific damage claims. But that focus is misplaced. As already noted, the very foundation of FMC's complaint is that Boesky, with other defendants' help, wrongfully misappropriated FMC's confidential business information and then used that information to further his own financial interests. We hold that this misappropriation constitutes a distinct

---

**16.** According to the district court, "if corporations undergoing recapitalization are to be reimbursed for the costs they incur because of conduct such as Boesky's the court believes that

remedy awaits fashioning by Congress; there is no precedent in the case law for this relief." *FMC Corp. v. Boesky,* 673 F.Supp. at 251.

and palpable injury that is legally cognizable under Article III's case or controversy requirement.

### A.

Confidential business information, even though intangible in nature, is corporate property, as the Supreme Court recently reiterated in *Carpenter v. United States,* — U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). In that case, R. Foster Winans, an investment advice columnist for the *Wall Street Journal* ("the *Journal* "), gave advance information on the timing and contents of his "Heard on the Street" column to two stockbrokers who bought and sold stocks based upon the column's probable impact on the market and, in exchange for the advance information, gave Winans a share of their profits. In affirming Winans's conviction for federal securities,[17] mail, and wire fraud, the Court held that the information concerning the timing and contents of Winans's column was the *Journal*'s property. According to the Court, " '[c]onfidential information acquired or computed by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit.' " *Carpenter,* 108 S.Ct. at 320 (citing 3 W. Fletcher, Cyclopedia of the Law of Private Corporations, § 857.1, at 260 (rev. ed. 1986) (footnote omitted)). Thus, the *Journal* "had a property right in keeping confidential and making exclusive use, prior to publication, of the schedule and contents" of Winans's columns. *Id.* at 320–21. Because Winans's scheme to share profits from trading in anticipation of his column's impact on the stock market deprived the *Journal* of its right to the exclusive use of its confidential prepublication information, the Court held that Winans had defrauded the *Journal* within the meaning of the federal mail and wire fraud statutes. As the Court noted, the concept of fraud includes embezzlement, which, in turn, includes the misappropriation of goods entrusted to one's care by another.[18] *Id.* at 321.

■ The same reasoning applies to FMC's claim. Under *Carpenter,* FMC had a property right in keeping confidential its consideration of the recapitalization and, later, of the recapitalization's terms. It had the right to make exclusive use of that information prior to its disclosure to the public. Like the *Journal* in *Carpenter,* FMC generated the information during the course of its business. It hired Goldman specifically to study its corporate structure, the growth nature of its principal businesses, and its long-term prospects, and to recommend the most attractive restructuring alternative. After deciding on the recapitalization, it retained Goldman to help work out the terms of the transaction. All of the information considered and developed in this process belonged to FMC. That FMC intended to keep this information confidential and that Goldman had a duty not to disclose it is beyond question. Under the parties' written letter agreement, Goldman agreed to keep confidential FMC's consideration of the recapitalization and all information disclosed by FMC in connection

---

17. The Court was evenly divided on whether Winans's fraud on the *Journal* was "in connection with" a purchase or sale of securities within the meaning of section 10(b) and Rule 10(b)(5) even though the victim of the fraud, the *Journal,* was not a buyer or seller of the securities in which the defendants traded, or otherwise a market participant. The Court therefore affirmed the district and appellate courts' judgments on those counts without discussion. *Carpenter,* 108 S.Ct. at 320.

18. According to the Court, Winans's undertaking at the *Journal* was not to reveal prepublication information about his column, because " 'a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge or information for his own personal benefit but must account to his principal for any profits derived therefrom.' " *Id.* at 321 (quoting *Diamond v. Oreamuno,* 24 N.Y.2d 494, 497, 301 N.Y.S.2d 78, 248 N.E.2d 910, 912 (1969)); *see also* Restatement (Second) of Agency §§ 388, comment c, 396(c) (1958). The Court also found that the *Journal*'s employee manual, which required that the *Journal*'s business information be kept confidential, removed any doubt about whether Winans had such a duty, and whether he specifically intended to defraud his employer. *Id.* at 322.

with it.[19]

Brown, then, misappropriated FMC's confidential information. Goldman allowed Brown access to the information, even though he was not a member of the "Project Chicago" team, and Brown passed it through the illegal trading chain to Boesky in knowing violation of his and his company's contractual and fiduciary duty to FMC. Brown "stole to put it bluntly," valuable nonpublic information entrusted to his company in the utmost confidence. *See United States v. Chiarella*, 445 U.S. 222, 245, 100 S.Ct. 1108, 1123, 63 L.Ed.2d 348 (1980) (Burger, C.J., dissenting). He then passed the stolen information through the illicit trading ring to Boesky so that both could profit from its use. Although FMC was not actually deprived of the information itself,[20] FMC, as a result of this

wrongful conduct, was denied the right to use exclusively its confidential information.

And that is an injury. As the *Carpenter* Court noted, "exclusively is an important aspect of confidential business information," *Carpenter,* 108 S.Ct. at 321. As long as a trade secret remains secret, it potentially has value in the hands of its owner. Because of this, laws protecting trade secrets, by protecting the value of confidential information, provide persons and companies with an incentive to develop potentially valuable new information. If someone destroys that secrecy, he or she deprives its owner of the information's potential value. Viewed in this light, the defendants' violation of FMC's right to the exclusive use of its confidential business information injured FMC as distinctly and as palpably as if the defendants stole a potentially valuable new machine from one of FMC's plants.[21]

---

**19.** Even in the absence of the written agreement, FMC had a right to the confidentiality of the information.

"It is well established ... that a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge for his own personal benefit but must account to his principal for any profits derived therefrom."

*Carpenter,* 108 S.Ct. at 321 (quoting *Diamond v. Oreamuno*, 24 N.Y.2d 494, 497, 301 N.Y.S.2d 78, 248 N.E.2d 910, 912 (1969)).

**20.** In this sense, the district court was correct in its observation that Boesky never really traded opposite FMC in the market with any "superior information." This does not mean, however, that FMC was not injured by the misappropriation of the information.

**21.** Despite the Court's unequivocal statement that "[c]onfidential business information has long been recognized as property," *Carpenter,* 108 S.Ct. at 320, the dissent calls this reading of *Carpenter* "overly broad." The dissent emphasizes the Court's statement that "[t]he *Journal,* as Winans' employer, was defrauded of much more than its contractual right to his honest and faithful service, an interest too ethereal in itself to fall within the protection of the mail fraud statute, which 'had its origin in the desire to protect individual property rights,' " *id.,* and stresses that the misappropriated information, the content and timing of the columns, is the *Journal*'s "stock-in trade." The dissent apparently believes that the misappropriation of FMC's confidential information concerning its recapitalization was an injury too "ethereal" to fall within the ambit of Article III because the

information was not FMC's "stock-in-trade" or of commercial or reputational value to FMC.

But this view has a number of problems. First, the Court, in its statement about the "ethereal" nature of an employer's contractual right to his employee's honest and faithful service, was addressing the scope of the federal mail fraud statute, specifically, the meaning of property within that provision. Whether something is "property" for purposes of criminal mail fraud, however, is an entirely separate question from what interests fall within the spectrum of potential Article III injuries. As our discussion above makes clear, that an interest is too "ethereal" to fall within the meaning of "property" for purposes of federal mail fraud does not mean that it cannot be the subject of an Article III injury.

Second, FMC also was deprived of more than its contractual right to Goldman's honest and faithful service. This is not a case where Goldman or one of its employees wrongfully *withheld* information or usurped an opportunity that rightfully belonged to FMC because of the parties' contractual or fiduciary relationship. Here, Goldman's Brown took FMC's confidential information *in violation of the parties' contract,* passed it along through the illegal trading ring to Boesky, and, in the process, destroyed whatever value it had in FMC's hands. Thus, FMC's injury was as distinct and palpable as that suffered by the *Journal* in *Carpenter,* where the Court held that Winans defrauded the *Journal* of property within the meaning of the federal mail and wire fraud statutes.

Third, whether a business's misappropriated or stolen property is its "stock-in-trade" cannot be dispositive of whether that business has suffered an Article III injury. Surely a company

**992**

### B.

■■ Underlying this property-interest injury to FMC, of course, are alleged breaches of state-law contractual and fiduciary duties which some of the defendants owed to the company. Although the district court did not find, as we do, that the defendants' misappropriation of FMC's confi-

dential information injured the company, it did recognize that FMC may have alleged valid state-law claims based upon such breaches.[22] The court, however, declined to exercise pendent jurisdiction over them after dismissing FMC's federal claims for lack of Article III injury. But to the extent the court implied that it could have entertained FMC's state-law claims despite its

that sells chemicals need not have its chemicals stolen before it can have standing. Moreover, to say that the confidential information concerning FMC's recapitalization was of no commercial value to FMC would be absurd. If that were true, FMC would not have contracted to protect it, and Brown and friends would not have misappropriated it. Just because it is difficult to place a dollar value on information does not mean it is worthless. And that FMC may not be able to recover the full amount of what it asserts is the information's value because it cannot make out a cause of action under a specific federal statute also does not mean the information is worthless. In any event, whether FMC is entitled to recover a specific amount of damages—*e.g.*, the increased "cost" of the recapitalization, the fee it paid to Goldman, or Boesky's profits—is not the question here, which is whether FMC was injured for purposes of Article III's case or controversy requirement.

Finally, the dissent apparently believes that if FMC had alleged plausibly that the defendants' illegal activities somehow diminished its reputation, it could jump over Article III's standing hurdle because that would mean that the information had commercial value. We agree. But *United States v. Grossman*, 843 F.2d 78 (2d Cir. 1988), which the dissent cites on this point, sheds interesting light on its reading of *Carpenter*. In *Grossman*, an attorney at a law firm representing trustees of a pension plan for employees of Colt Industries in connection with Colt's proposed recapitalization leaked confidential information about that recapitalization to friends and relatives, who then profited handsomely when the public announcement of the proposal sent the price of Colt stock up from about $66.00 to $94.00 per share. A jury convicted the attorney for mail fraud and he appealed, arguing that the confidential business information he misappropriated from his law firm was not "property" because: (1) the information had no commercial value to his law firm, which had no exclusive right to exploit it; and (2) his law firm did not gather the information at the cost of its own enterprise, organization, skill, labor, and money.

The Second Circuit rejected Grossman's arguments, holding that Carpenter does not require that all confidential information be of the same nature as the content and timing of the *Journal*'s columns to be considered "property" under the mail fraud statute. *Id.* at 86. To the contrary, "*Carpenter* actually holds generally that, even though 'confidential business infor-

mation' is intangible, it 'has long been recognized as property.' " *Id.* (quoting *Carpenter*, 108 S.Ct. at 320). To the Second Circuit, then, the information concerning Colt's recapitalization was "property" under *Carpenter*. *Id.* In addition, the court held, "that the law firm could not commercially exploit the information by trading on it does not mean the confidentiality of the information had no commercial value to the firm. As several partners of the firm testified, maintaining the confidentiality of the information was of commercial value because, by maintaining confidentiality, the firm would protect or enhance the firm's reputation, with the result that it would not lose its clients and perhaps would gain more clients." *Id.*

For Judge Manion, then, Grossman lends support to his view that if FMC could allege an injury to its reputation resulting from the misappropriation of its confidential information, it could claim an injury for purposes of Article III. This to us seems a reasonable reading of *Grossman*. But, taken together, Judge Manion's reading of *Carpenter* and *Grossman* paints an interesting picture. On the one hand, he argues that, under *Carpenter*, FMC's confidential business information was too ethereal to be "property" for purposes of federal mail fraud and could not be the subject of an Article III injury because it was not the company's stock-in-trade and lacked commercial value. On the other hand, his reading of *Grossman* suggests that the same confidential information in the hands of FMC's law firm or Goldman was "property" for purposes of mail fraud and, because it would have commercial value—certainly both FMC's law firm and Goldman also had a reputational interest in keeping the information confidential—its misappropriation would suffice for purposes of an Article III injury. Under this reasoning, Goldman could bring a civil action against Brown and Boesky and friends, but FMC, the actual owner of the information, could not. This seems a strange result.

22. The district court noted that, "[p]erhaps, the $17 million which FMC says it is entitled to recover from Goldman gives FMC standing to seek recovery of that amount from that defendant on a theory of breach of contract or breach of fiduciary duty," 673 F.Supp. at 249, and that, even though FMC's federal claims had to be dismissed "on the lack of Article III standing, the state law claims may still be viable," *id.* at 252.

holding that FMC lacked constitutional standing, its disposition was somewhat illogical. For if FMC had no constitutional standing, the court could not have exercised pendent jurisdiction over the state-law claims even if it wanted to. Constitutional standing, as we have noted, involves the benchmark question of justiciability: whether a litigant can make out a case or controversy under Article III. If a litigant fails to make this showing because she fails to allege sufficiently an injury, she cannot pursue *any* claim in federal court.

The court's disposition of FMC's claims thus raises a follow-up question: Did the district court's apparent belief that FMC had alleged sufficiently a state-law cause of action for breach of contract or fiduciary duty contradict its holding that FMC lacked an identifiable Article III injury? In other words, would the invasion of a recognized state-law right in itself satisfy Article III's injury requirement, even though an injury separate and apart from the actual invasion is difficult to identify? As the Supreme Court has stated, standing "often turns on the nature and source of the claim asserted." *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206. For example, the "actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *Id.* The same must also be true of legal rights growing out of state law. If not, federal courts sitting in diversity could not adjudicate some cases involving only state-law breach-of-fiduciary duty claims, which they often do, because some actions for breach of fiduciary duty do not require the plaintiff to show an injury. In such a case, the actual or threatened injury required by Article III exists solely by virtue of the recognized state-law right, the invasion of which creates standing. Properly pleaded violations of state-created legal rights, therefore, must suffice to satisfy Article III's injury requirement. Thus, even in the absence of a specific finding that FMC was injured by the misappropriation of its confidential business information, FMC sufficiently alleged the violation of a state-law right that in itself would suffice to satisfy Article III's injury requirement.[23]

23. Judge Manion disagrees. He writes in his dissent that, even if the district court had found that FMC had alleged state law claims upon which relief could be granted, that would not have contradicted its holding that FMC suffered no Article III injury. To bring a diversity action in federal court, however, a litigant first must satisfy Article III's case or controversy requirements and, in addition, the statutory requirements for diversity jurisdiction. There can be no diversity jurisdiction in the absence of an Article III case or controversy. Thus, if FMC alleged state law claims upon which relief could be granted in a federal diversity case—for example, a breach of contract or fiduciary duty claim against Goldman or Brown for damages or profits resulting from the misappropriation of FMC's information—that would necessarily mean that FMC had suffered an Article III injury.

*Tileston v. Ullman*, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943), does not dictate otherwise. In *Tileston*, a physician sought a declaratory judgment in Connecticut state court as to whether a state antiabortion statute applied to him and, if so, whether it endangered the lives of certain of his patients and thereby violated *their* fourteenth amendment rights.

The physician alleged that the statute, if applicable to him, would prevent his giving professional advice concerning the use of contraceptives to three patients whose condition of health was such that their lives would be endangered by childbearing, and that appellees, law enforcement officers of the state, intend to prosecute any offense against the statute and "claim or may claim" that the proposed professional advice would constitute such an offense. The complaint set out in detail the danger to the lives of [the physician's] patients in the event that they should bear children, *but contained no allegations asserting any claim under the Fourteenth Amendment of infringement of [the physician's] liberty or his property rights.*

*Id.* at 45, 63 S.Ct. at 493 (emphasis added). The Connecticut Supreme Court of Errors assumed without deciding that the case was an appropriate one for a declaratory judgment and ruled that the statute applied to the physician and was constitutional. *Id.* at 45–46, 63 S.Ct. at 493–94. The Supreme Court dismissed the physician's appeal for lack of standing, however, holding that the case presented no constitutional question which the physician had standing to assert.

The sole constitutional attack upon the statutes under the Fourteenth Amendment is confined to their deprivation of life—obviously not [the physician's] but his patients'. There is no allegation or proof that appellant's life is in danger. His patients are not parties to this proceeding and there is no basis on which we can say that he has standing to secure an adjudication of his patients' constitutional

## C.

█ In any event, FMC's injury also is both traceable to the defendants' putatively illegal conduct and is redressable by the requested relief—damages. FMC's injury —the loss of the exclusive use of its confidential business information—was the result of the defendants' misappropriation of that information which, FMC alleges, violated several federal statutes as well as state common laws. It follows that FMC, if it can prove its allegations and satisfy the requirements of each specific cause of action it pursues, is entitled to recover in damages the best measure of the value of the denial of its exclusive use of the information. FMC, of course, has asserted a number of damage theories, but we need not comment upon any of them for purposes of this opinion. It suffices that FMC's alleged injury is traceable to the defendants' putatively illegal conduct and is redressable by the requested relief.

## VI.

We therefore hold only that the district court erred in dismissing FMC's complaint for lack of Article III or constitutional standing. We do *not* hold that FMC has satisfied any of the nonconstitutional or prudential standing limitations recognized in this opinion. For example, we leave it to the district court to determine whether FMC's federal claims falls within the zones

of interests protected by the federal statutes under which FMC seeks relief. Such a determination on review, without the benefit of the district court's prior careful consideration of questions involved, would be inappropriate. The case is thus remanded to the district court for further consideration in light of this opinion.

REVERSED AND REMANDED.

RIPPLE, Circuit Judge, concurring.

I join the judgment of the court and the basic rationale of Chief Judge Bauer's opinion. It is important to emphasize, at the beginning of the inquiry, that we are dealing with a *very* early stage of the litigation. The district court dismissed the entire case because, in its view, it was without subject matter jurisdiction. The court held that the parties had not brought before it a case or controversy, the constitutional prerequisite to the exercise of federal judicial jurisdiction. It reached no other question. Accordingly, on this appeal, our sole task is to determine whether the district court was correct when it dismissed the entire case on this threshold question.

As Chief Justice Warren noted in *Flast v. Cohen,* "[s]tanding has been called one of 'the most amorphous [concepts] in the entire domain of public law.'" 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968) (quoting Hearings on S.2097 before

right to life, which they do not assert in their own behalf.
*Id.* at 46, 63 S.Ct. at 494.
*Tileston* thus stands for the general and well-recognized proposition that a litigant cannot have standing based upon his or her assertion of others' rights. And because the physician in *Tileston* was not suing to vindicate his own legal rights under state law, it is difficult to see how the case rebuts our point that the violation of a legal right recognized by state law must suffice to satisfy Article III's injury requirement, even in the absence of an injury apart from the violation of the right. The dissent makes much of the fact that the Connecticut court in *Tileston* rendered a judgment on the merits, and the Supreme Court's statement that, had it not dismissed the physician's appeal for lack of standing, it still would have had to determine whether the suit presented a genuine case or controversy. But the Connecticut court's decision on the merits is insignificant. As the Supreme Court noted, the state court assumed without

deciding that the case was an appropriate one for a declaratory judgment. *Tileston,* then, just makes clear that a state court's implicit recognition of standing is not binding on the Supreme Court. Certainly, the Connecticut court in *Tileston* did not bestow upon its state's physicians a legal duty or right to assert their patients' interests. If the Connecticut court had explicitly done so, that would have made the case a much more interesting one. As for the Court's statement that it would still have to determine whether there was a genuine case or controversy even if the physician had standing, there are other components of the case or controversy or "justiciability" question, such as ripeness, mootness, political questions, etc. The Court may have been referring to these other considerations, some of which arguably were implicated by the physician's action. In any event, we are unable to see how this supports the dissent's assertion that the violation of a state law right, without more, cannot suffice to satisfy Article III's injury requirement.

the Subcommittee on Constitutional Rights of the Senate Judiciary Committee, 89th Cong., 2d Sess. 465, 498 (1966) (statement of Prof. Paul A. Freund)). He suggested, therefore, that courts begin their analysis of a standing problem by recalling that standing is really a conceptual subdivision of a broader jurisdictional requirement—the "case or controversy" requirement of Article III. This constitutional limitation on the power of federal courts embodies, noted Chief Justice Warren, "two complementary but somewhat different limitations." *Id.* at 95, 88 S.Ct. at 1949–50.

In part those words limit the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government. Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine.

*Id.*

As Chief Judge Bauer points out, this case does not implicate directly separation of powers concerns. It does, however, directly implicate the constitutional policy concern, embodied in the case or controversy requirement, of preserving the adversary process. In short, does the plaintiff allege " 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends …?' " *Id.* at 99, 88 S.Ct. at 1952 (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)).

As the Chief Judge points out, Chief Justice Warren's formulation has been refined by subsequent decisions of the Supreme Court. Justice Powell's formulation in *Gladstone, Realtors v. Village of Bellwood* is perhaps the most concise formulation: "In order to satisfy Art. III, the plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." 441 U.S. 91, 99, 99 S.Ct. 1601, 1607–08, 60 L.Ed.2d 66 (1979); *accord Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 260, 97 S.Ct. 555, 560, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). "In determining whether there is standing, 'the court assumes *arguendo* that [the appellant] [has] pleaded and could prove a violation of substantive law, and asks only whether [it] [has] alleged a concrete injury and a sufficient casual relationship between the injury and the violation.' " *United States v. Nichols,* 841 F.2d 1485, 1498 (10th Cir.1988) (quoting *Industrial Inv. Dev. Corp. v. Mitsui & Co.,* 671 F.2d 876, 888–89 (5th Cir. 1982)).

The application of these basic principles to this case is somewhat difficult only because of the very early stage of the litigation. However, in my view, the essential elements of constitutional standing are present. The plaintiff has *alleged* that it has suffered a "distinct and palpable injury." *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206. The plaintiff also has *alleged* "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power,* 438 U.S. at 72, 98 S.Ct. 2630. The complaint alleges that, because of the theft and misuse of private corporate information, the corporation paid out an additional $220 million in connection with its recapitalization scheme than it originally had intended. It also incurred additional fees and expenses in implementing the plan. These additional costs caused FMC to change its corporate structure by taking on additional debt and skewing the equity position of the shareholders in favor of management and the Thrift Plan. The complaint alleges that this injury resulted

from breach of a fiduciary duty owed to FMC by the appellees and the subsequent insider trading in FMC stock stemming from that breach. The appellees obfuscate the issue of injury by concentrating only on whether the FMC shareholders lost money. The alleged (and that is all that is necessary at this stage) injury to FMC for purposes of Article III standing, however, is that the structure of the corporation was changed as a result of illegal conduct on the part of the appellees. It is the corporation itself that is vitally affected by the change in its structure and, therefore, it is the proper plaintiff to bring this action because it has alleged "a 'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 1664, 75 L.Ed.2d 675 (1983) (quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)).

Fulfillment of these basic requirements of standing is not, of course, the only hurdle that the plaintiff must overcome in order to proceed. It is also necessary that it establish that the injury it alleges be one against which the law affords protection. "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S.*, 410 U.S. at 617 n. 3, 93 S.Ct. at 1148 n. 3, *see also Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 212, 93 S.Ct. 364, 368, 34 L.Ed.2d 415 (1972) (White, J., concurring); *Sierra Club v. Morton*, 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972); *Hardin v. Kentucky Utilities Co.*, 390 U.S. 1, 6, 88 S.Ct. 651, 654, 19 L.Ed.2d 787 (1968). However, it is also necessary that the "statutory provision on which the claim rests properly ... be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206 (footnote omitted). As Chief Judge Bauer suggests, this question can be approached as an aspect of the prudential rules of standing. *See id.; see also Herpich v. Wallace*, 430 F.2d 792,

805–06 (5th Cir.1970) (holding that only purchasers and sellers of securities have standing to bring a private cause of action under section 10(b) and Rule 10b–5 because only they can incur the injury proscribed by those provisions). It also can be addressed quite separately from the standing question in terms of whether the plaintiff has stated a cause of action. *See Eason v. General Motors Acceptance Corp.*, 490 F.2d 654, 658 (7th Cir.1973) ("Instead of stating the issue in terms of standing, we think it is more useful to ask whether the plaintiffs were members of the class for whose special benefit Rule 10b–5 was adopted."), *cert. denied*, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

Regardless of which of these formulations is employed, the essential question remains the same: Do the federal or state statutory provisions upon which each cause of action is predicated afford protection for the plaintiff from the sort of harm alleged in the complaint? To determine whether there is injury that gives rise to a cause of action, a court must analyze the particular provisions of the relevant statutes. With the exception of the Rule 10b–5 allegation, the district court did not undertake a comprehensive analysis of the complaint. Specifically, the district court made no factual findings or legal conclusions with respect to any of the other sections of the securities laws alleged in the complaint. In addition, the district court never addressed the RICO issue. Such a detailed scrutiny of the complaint is necessary before it can be determined whether the plaintiff may proceed. It is inappropriate that such an inquiry be undertaken for the first time on appeal. Accordingly, the judgment of the district court must be reversed and the case remanded for further proceedings. On remand, the district court must address whether the plaintiffs fall within the protection of any of the provisions serving as a predicate for its complaint. While the district court did address the Rule 10b–5 claim, it would be premature to decide the correctness of its analysis at this point and perhaps unfair to preclude further consideration on remand.

MANION, Circuit Judge, dissenting.

I respectfully dissent. I would adopt and affirm the district court's opinion, which is reported at 673 F.Supp. 242 (N.D.Ill.1987). FMC may be irritated, but it has not been injured. Individual shareholders who sold low may have been injured—and management shareholders who bought higher than they would have liked may think of themselves as injured—but they are not parties, and FMC has no standing to sue on their behalf.

FMC claims that Boesky's misdeeds caused it to pay an additional $235 million to recapitalize. But that additional payment was to its shareholders. As with any corporation, FMC's assets belong to its shareholders, and a transfer from the corporation's treasury to the shareholders damages no one. As Judge Williams stated in her opinion, "[t]he economic effect of the transaction can therefore properly be viewed as a distribution of part of FMC's assets to the owners of those assets in exchange for their giving up a part of their equity interest to management." 673 F.Supp. at 250.

FMC's management obviously preferred the original plan proposed before Boesky's interference, but—as the majority notes in footnote 8—FMC could have but chose not to abandon the recapitalization. Instead, as the majority acknowledges in footnote 11, FMC's board (and management) maintained that the recapitalization was good for the company and its shareholders because it would lead to a higher return on equity. The recapitalization was approved by both the board and the shareholders after Boesky "manipulated" the price. Thus, according to the face of the complaint, the entire injury FMC claims to have suffered, including the additional expenses incurred after Boesky's involvement, was merely the cost of FMC's *choice* to finance future opportunities other than through retained earnings. *See* D. Fischel, *The Law and Economics of Dividend Policy*, 67 Va.L.Rev. 699, 701–02 (1981). In his concurrence, Judge Ripple well captures the essence of FMC's position when he writes that "[t]he alleged ... injury to FMC for

purposes of Article III standing, however, is that the structure of the corporation was changed.... It is the corporation itself that is vitally affected by the change in its structure." In my view, varying the proportion of debt to equity or otherwise changing a company's capital structure does not affect its value. *See* F. Modigliani and M. Miller, *The Cost of Capital, Corporation Finance and the Theory of Investment*, 48 Am.Econ.Rev. 261, 268–71 (1958). As Judge Williams stated, "it is difficult to articulate FMC's injury when all of the shareholders benefited from the transaction, and there are no allegations of harm to creditors of FMC." 673 F.Supp. at 251. With no injury to be found anywhere, the district judge properly found no constitutional standing and thus properly declined to call upon pendent jurisdiction to consider whether there were well-pleaded state law claims.

I specifically disagree with the majority's invocation of *Carpenter v. United States*, — U.S. —, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), to support its premise that the defendants' "wrongful misappropriation" of confidential information, without more, constitutes a distinct and palpable injury to FMC. Under that premise, every breach of fiduciary duty that could give rise to a state law cause of action by the principal against the fiduciary to recover the fiduciary's profits would make out a constitutional injury. This is an overly broad reading of *Carpenter*. See *United States v. Ochs*, 842 F.2d 515, 526 (1st Cir.1988).

As the Court emphasized in *Carpenter*, "[t]he Journal ... was defrauded of much more than its contractual right to [its employee's] honest and faithful service, an interest too ethereal in itself to fall within the protection of the mail fraud statute, which 'had its origin in the desire to protect individual property rights.' " *Carpenter*, 108 S.Ct. at 320 (quoting *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 2881 n. 8, 97 L.Ed.2d 292 (1987)). The content and timing of the columns are the Journal's stock-in-trade, its product. *Ochs*, *supra*, 842 F.2d at 526. Any prepublication release damages the Journal's reputation and the confidence its readership has

in its product. In addition, enough trading caused by advance knowledge of a column's timing and contents could by itself actually affect the quality (= accuracy) of the product by changing the stock's price for reasons unrelated to those discussed in the column.

In contrast, chemicals are FMC's stock-in-trade, not confidential restructuring advice. FMC does not allege that the information by itself had any commercial value to FMC or that its capital structure affected customers' decisions about whether to buy its chemicals. FMC further does not allege that Boesky's activities diminished its reputation. If anything, to the extent that a higher stock price is prestigious, Boesky's activities enhanced its reputation.[1] Cf. United States v. Grossman, 843 F.2d 78 (2d Cir.1988) (law firm enhanced its reputation by showing ability to protect information about client's recapitalization. Therefore, the information was its "property" within meaning of mail and wire fraud statutes.).

In addition, Boesky's "misappropriation" did not damage FMC because its "loss" due to publication was the FMC shareholders' "gain."[2] FMC does not explain why its management was entitled to the exclusive use of the information generated by its investment advisors. The shareholders were paying for this information about the value of the corporation, and this information was their property.

These problems with defining the "property" which FMC lost when FMC has suffered no financial harm reemphasize that FMC has suffered no injury in the constitutional sense. Assuming arguendo that the information Boesky found out was FMC's property for purposes of the RICO statutes under which FMC sues, this would still not without more confer Article III standing upon FMC. The majority correctly cites Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) for the

proposition that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing....'" But even when a plaintiff alleges that a defendant has violated a statute, the plaintiff must also allege that he has been injured by the violation to establish constitutional standing. O'Shea v. Littleton, 414 U.S. 488, 493 n. 2, 94 S.Ct. 669, 675 n. 2, 38 L.Ed.2d 674 (1974). Requiring constitutional injury prevents Congress from manipulating the courts: "the absence of any such requirement would mean that the federal courts could be put in the position of having to enforce a rule—even (or perhaps especially) when the Government is unwilling to do so and Congress may be acquiescing in, or even supporting, the violation—at the behest of any individual, with no claim of any personal harm from the asserted violation." Hart & Wechsler, The Federal Courts (P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler 1973), Supp.1981 at 63 (footnote omitted).

Here, there is no constitutional standing, and it cannot be supplied by FMC's pendent state law claims. The district judge did not hold that the state law claims stated a claim upon which relief could be granted; she expressly did not reach the question. Even if she had, that would not, as the majority states, have contradicted her holding that FMC lacked an Article III injury. The majority offers no authority for its assertion that Article III's injury requirement is met by the violation of "legal rights growing out of state or common law." That position is directly contrary to the Supreme Court's holding in Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943) (per curiam). In Tileston, a physician challenged in Connecticut state court the constitutionality of a state anti-abortion statute on the ground that it endangered the lives of his patients. The Connecticut Supreme Court of Errors ruled

---

1. For example, Business Week publishes an annual listing which ranks U.S. companies by market value. In the latest ranking published on April 15, 1988, FMC placed in the 499th position. 1988 Special Issue, Bus. Wk. (April 15, 1988) at 202.

2. For purposes of determining constitutional standing, I do not reach whether the "misappropriation" theory could lead to a claim under the federal securities laws.

that the statute was constitutional. On appeal, the United States Supreme Court dismissed the appeal on the ground that the physician lacked standing, 318 U.S. at 46, 63 S.Ct. at 494, even though the state's highest court had rendered a judgment on the merits. The Court further noted that if it were not dismissing the appeal for lack of standing, the Court would otherwise have to determine if a genuine case or controversy existed, again even though the state's highest court had rendered a judgment on the merits. *Id.*

There is no way to get around FMC's lack of injury. The shareholders, through FMC, are attempting to recover a second time as a judgment from the defendants what they have already received from the corporate assets in the alleged "overpayment" in the recapitalization. As Judge Williams stated when citing one defendant's metaphor, "FMC here asks that it be allowed to shift corporate assets from the left pocket to the right pocket, and then to refill the left pocket by a recovery from the defendants." 673 F.Supp. at 248. I would therefore hold that there is no injury, and thus no constitutional standing.