Richard **LEVINE, Polly S. Gutman, Harley Kravitz, Jami Lynn Levy, Joel A. Levy, Todd Middleton, Andrew W. Gallopo, Plaintiffs,**

v.

**PRUDENTIAL BACHE PROPERTIES, INC., and Prudential Bache Securities, Inc., Defendants.**

No. 92 C 52.

United States District Court, N.D. Illinois, Eastern Division.

June 3, 1994.

---

Herbert Beigel, Beigel, Schy, Lasky, Rifkind, Goldberg & Fertik, Chicago, IL, for plaintiffs.

Timothy A. Nelsen, Skadden Arps Slate Meagher & Flom, Chicago, IL, for defendants.

## MEMORANDUM OPINION

GRADY, District Judge.

Before the court is the motion of defendants Prudential–Bache Properties, Inc. and Prudential–Bache Securities, Inc. ("the Prudential defendants") to dismiss the 45–count first amended complaint ("the complaint"). For the reasons discussed in this opinion, the motion is granted.

## BACKGROUND

This lawsuit concerns three limited partnerships in which the plaintiffs invested. The partnerships, known collectively as the Summit Funds (and individually as "LPI," "LPII" and "LPIII"), were organized for the purpose of investing in certain real-estate projects financed by municipal bonds. Defendant Prudential–Bache Properties, Inc. was the general partner in the partnerships, and defendant Prudential–Bache Securities, Inc. served as the sales agent for the partnerships. Several other defendants, including Norman Tandy and Norman Tandy Associates ("the Tandy defendants"), and the Related Companies, Inc. ("the Related defendants," together with several affiliated entities named in the suit), have exited this litigation by way of settlement, while the Prudential defendants remain in the case.

The Prudential defendants marketed the limited partnerships as investments in certain mortgage bonds, issued by state and local governments. The bonds were to finance the construction of retirement and multifamily apartment buildings. Revenue from these projects would pay off the bonds and provide the investors with a tax-exempt return. The Prudential defendants disclosed these investment objectives in a series of prospectuses, which the plaintiffs, who purchased in the aftermarket, now assert were fraudulent. The complaint alleges that the investment program in fact was an unlawful scheme in which the Prudential defendants and other defendants planned to reap undisclosed profits at the expense of the limited partnerships' performance as investments.

In the alleged scheme, the Prudential defendants conspired with the Tandy defendants to shake down the third-party developers of the bond-financed construction projects. The Tandy defendants acted as a construction consultant for the projects, overseeing the work and the expenditure of the limited partnerships' funds. The complaint alleges that the Tandy defendants, while acting in concert with the Prudential defendants, used their position to coerce the developers into buying labor and materials from "affiliates" of the Tandy defendants. Through this alleged "kickback" scheme, development costs rose and investment return declined. The complaint also alleges that when developers did not cooperate with the Tandy defendants' shakedown attempts, the Prudential or other defendants would drive those projects into default and take control of the projects themselves. Once in control, the defendants would pocket additional management and construction fees, again to the detriment of the Summit Funds' investment return, the complaint alleges.

The gravamen of the complaint, which is a putative class and derivative action, charges that by not disclosing the foregoing scheme, the defendants violated:

(1) Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 (Count I);

(2) The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Count II);

(3) The securities laws of 40 states (Counts III–XLII); and

(4) State common law against fraud, breach of fiduciary duty and negligence (Counts XLIII, XLIV and XLV, respectively).

The complaint names the Prudential defendants in all counts, and the Tandy defendants in Count II only.

In their motion to dismiss the complaint, the Prudential defendants have raised numerous grounds, including:

(1) The complaint's allegations fail to state the circumstances of the charged fraud with sufficient particularity under Fed. R.Civ.P. 9(b);

(2) The complaint's 10b–5 claims are legally inadequate because, among other reasons, the plaintiffs lack standing, the claims are time-barred, and plaintiffs purchased in the aftermarket and therefore could not have relied on the allegedly misleading prospectuses;

(3) The RICO claims are insufficiently pleaded for reasons including standing, time bar, and lack of specificity as to the predicate acts of mail and wire fraud;

(4) The state law claims should be dismissed largely on the same grounds as the federal claims, or for lack of supplemental federal jurisdiction.

The court will proceed to analyze these arguments, starting with the first, which concerns all of the fraud allegations and thus has the broadest application to the complaint as a whole.

### ANALYSIS

### I. Particularity Under Rule 9(b)

Rule 9(b) requires litigants to plead the "circumstances" of alleged fraud with particularity, while allegations of motive, knowledge and intent may be pleaded generally. Fed.R.Civ.P. 9(b). The rule serves three purposes: (1) informing defendants of the nature of the alleged wrong, so they may mount an adequate defense; (2) eliminating conclusory complaints filed as a pretext for

using discovery to uncover heretofore unknown wrongs; and (3) protecting defendants from spurious fraud charges that might be particularly damaging to reputation. *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 776–77 (7th Cir. 1994); *Reshal Assoc., Inc. v. Long Grove Trading Co.*, 754 F.Supp. 1226, 1230 (N.D.Ill. 1990); *Coronet Ins. Co. v. Seyfarth*, 665 F.Supp. 661, 666 (N.D.Ill.1987); *McKee v. Pope, Ballard, Shepard & Fowle, Ltd.*, 604 F.Supp. 927, 932 (N.D.Ill.1985). The particularity requirement of Rule 9(b) nonetheless must be read in conjunction with Rule 8, which provides that complaints should contain a "short and plain statement of the claim." Fed.R.Civ.P. 8; *Tomera v. Galt*, 511 F.2d 504, 509 (7th Cir.1975). In *Tomera*, the Seventh Circuit stated that Rules 8 and 9(b) are satisfied in fraud cases by "a brief sketch of how the fraudulent scheme occurred, when and where it occurred, and the participants." *Id.* Since *Tomera*, our appeals court has elaborated somewhat on that standard. Pleading the "circumstances" of fraud with particularity "means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). The plaintiff alleging fraud must state the identity of the person making the misrepresentation; the time, place and content of such misrepresentation; and the method by which it was communicated to the plaintiffs. *Vicom*, 20 F.3d at 777–78; *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir.1992).

◼ In the instant case, the Prudential defendants do not dispute the plaintiffs' pleading of the time, place, content and manner of communication of the statements they allege to be fraudulent, although the complaint does not completely clarify those issues.[1] The dispute concerns the plaintiffs' leveling of fraud charges against all defendants collectively, without a detailed description of what role each individual defendant played. The complaint specifically avers that the Tandy defendants used their influence as construction consultant to steer business toward their friends and affiliates. Complaint at ¶ 23. But as to the Prudential defendants, the complaint simply lumps them together with the Tandy defendants by stating that each defendant "participated" in the kickback scheme, and by attributing the scheme to "defendants." *Id.* at ¶¶ 21, 22. The Prudential defendants argue that Rule 9(b)'s particularity requirement requires that the complaint give more specifics as to what role each defendant played, especially the Prudential defendants.

The Seventh Circuit recently spoke approvingly of a line of cases interpreting Rule 9(b) and holding that when a complaint implicates multiple defendants, it should not "lump together" the defendants but should inform each defendant of the nature of his or her participation in the alleged fraud. *See Vicom*, 20 F.3d at 777–78 (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987)). The appeals court recognized, though, that a plaintiff need not individualize the role of multiple defendants when the necessary information is "uniquely within the defendant's knowledge." *Vicom*, 20 F.3d at 778 n. 5 (citing *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992)).

The court believes the sufficiency of the pleaded link between the Prudential defendants and the overall fraudulent scheme should be governed by the liberal standard articulated by the Seventh Circuit in *Tomera*. Here, the plaintiffs have made particular allegations as to how the scheme worked. They have made general allegations that the Prudential defendants knowingly participated in the scheme. Rules 8 and 9(b) do not

1. The complaint makes only sweeping reference to the "offering materials," including but not limited to private placement memoranda or prospectuses. The complaint does not give the dates these materials were distributed, although it refers to the dates when the putative class representatives invested their funds. Although the court believes the plaintiffs should have provided more specificity as to the time, place and manner of distribution of these materials, the defendants' response makes clear that the prospectuses at issue were dated February 19, 1986; July 7, 1986; and June 10, 1987.

require more,[2] and the information that would permit a more individualized pleading would appear to lie in the exclusive possession of the defendants. Pleading of specific facts showing the Prudential defendants' participation in the alleged fraud, or their possible motives for participating, also sound more in the nature of evidentiary details under a regime of "full-scale fact pleading" that Rule 9(b) does not impose on fraud complaints. *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992). The Seventh Circuit has never held that Rule 9(b) requires the parties to plead their theory of the case; they generally need not make allegations detailing the parties' relationship or the falsity of the misrepresentations or omissions. *See Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521, 523 (7th Cir.1993).

Moreover, a complaint does not run afoul of Rule 9(b) if the defendants can make enough sense of it so that they may mount an answer or defense. *See Douglas v. Tonigan*, 830 F.Supp. 457, 462 (N.D.Ill.1993) (Grady, J.) ("The allegations are sufficient if the defendant is in a position to understand the nature of the [allegedly fraudulent] conduct ... and can defend against the allegations."). This court concurs with the plaintiffs' assertion that "it cannot be that difficult for these defendants to either admit or deny that they knowingly made misrepresentations or took kickbacks." Plaintiffs' Consolidated Response to Motions to Dismiss the First Amended Class Action Complaint ("Response"), at 18. The allegations are not too cryptic, vague or conclusory for the defendants to understand them and to determine whether they are chimerical. *See Reshal Assoc., Inc. v. Long Grove Trading Co.*, 754 F.Supp. 1226, 1232 (N.D.Ill.1990) (finding that fraud allegations involved a relatively small number of defendants and were not excessively cryptic or conclusory so as to warrant dismissal under Rule 9(b)); *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 749 F.Supp. 869, 872 (N.D.Ill.1990) (holding that although general rule requires that a complaint against multiple defendants must give notice of each defendant's role, complaint may be less specific as long as defendants are not "left guessing" about the general nature of the alleged fraud and have sufficient information to answer the allegations).

The Prudential defendants' motion to dismiss the complaint for failure to plead fraud with particularity must be denied.

## II. Count I: The Securities Fraud Claims

The Prudential defendants advance several arguments for their proposition that Count I of the complaint fails to state a claim under the federal securities laws. They argue that Count I should be dismissed: (1) for reasons of standing and limitations; (2) because Count I inadequately pleads scienter, and; (3) because Count I does not properly plead reliance or causation with respect to these securities transactions, which took place in the aftermarket rather than in an initial public offering. Only the third argument presents a basis for Count I's dismissal, which the court will order without prejudice.

### A. Effect of Aftermarket Nature of Transactions

In citing the aftermarket nature of the Summit Funds transactions, the Prudential defendants first argue that in the absence of reliance on the prospectuses, the plaintiffs as aftermarket purchasers cannot show a causal link between their losses and any misrepresentations in the offering materials. Second, the Prudential defendants argue that Count I in reality is a claim for breach of fiduciary duty and so may not be "bootstrapped" into a 10b-5 securities fraud claim.

### 1. Reliance and "Fraud on the Market"

Arguing that Count I should fail because plaintiffs have not pled reliance on the prospectuses, the Prudential defendants quote the following passage from *Basic, Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989-90, 99 L.Ed.2d 194 (1988): "Reliance

---

**2.** The Prudential defendants have not argued that their liability would require proof of their partic-

ipation in each and every fraudulent act comprising the entire scheme.

provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." But to the extent that sentence is quoted in support of the notion that reliance is a required element of a 10b–5 claim, it is quoted out of context. The *Basic* opinion goes on to state that "[t]here is, however, more than one way to demonstrate the causal connection." *Id.* As the Seventh Circuit recently explained, *Basic* "shows that reliance is not essential." *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1129 (7th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994). Instead, reliance is simply a means for establishing that material misrepresentations or omissions caused the plaintiff an injury. *Id.* In essence, the § 10(b) plaintiff must show a causal connection between the decision to buy a security and the defendants' alleged misstatements or omissions. *Rowe v. Maremont Corp.,* 850 F.2d 1226, 1233 (7th Cir.1988). In *Basic,* the Supreme Court held that in a Rule 10b–5 action, even where an investor cannot prove he or she directly relied upon a misleading prospectus, the prospectus nonetheless will be presumed to have caused the investor's injury where the price of the security in an open and developed market reflects the misrepresentations in the prospectus along with all other publicly available information. *Basic,* 485 U.S. at 245–47, 108 S.Ct. at 990–92. The *Basic* doctrine has come to be known as the "fraud-on-the-market" theory of causation.

In their response brief, the plaintiffs have invoked a "fraud-on-the-market" causation theory. Their problem, however, is that they have invoked the wrong one. Whereas the holding in *Basic* was premised on the existence of an "open and developed" market for the securities, the plaintiffs suggest that they relied not on a market-generated price, but on the mere fact that the securities actually reached the market, citing *Shores v. Sklar,* 647 F.2d 462, 469–70 (5th Cir.1981) (en banc), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983). The Seventh Circuit has declined to adopt the *Shores* presumption of causation, which it termed a theory of "fraud-created-the-market." *Eckstein,* 8 F.3d at 1130. Relying on this theory, plaintiffs attempt to establish the causal link between

the prospectuses and their aftermarket purchases by arguing that if the alleged fraudulent circumstances had been disclosed, the securities never would have reached the market. Therefore, when plaintiffs purchased in the aftermarket, their purchases still were induced by the fraudulent prospectuses that the defendants used to market the securities in the first place, according to this argument.

This is not the same as arguing that a prospectus induced an aftermarket purchase because the statements within it became a part of the general mix of market information resulting in a price the plaintiff paid for the securities. In declining to adopt the reasoning of *Shores,* or the "fraud-created-the-market" theory, the Seventh Circuit in *Eckstein* noted that the fundamental rationale for the holding in *Basic* assumes that a security's price reflects the defendant's representations in the prospectus; such an assumption can be valid only in an "open and developed" market in which the price results from competition among knowledgeable investors. *Id.* at 1129–31. In *Eckstein,* the defendant's initial securities offering was conditioned on the raising of at least $35 million. The Eckstein plaintiffs had never read the allegedly misleading prospectus, but they argued that if the prospectus had been complete and truthful, the defendant would never have met the minimum sales requirement and would have had to refund the plaintiffs' investments; ergo, causation. But the Seventh Circuit refused to presume causation simply because the defendants were able to market the securities, reasoning that a security may still reach the market even with full disclosure of the type of negative information that a fraudulent issuer might conceal. *Id.* "[T]he linchpin of *Shores*—that disclosing bad information keeps securities off the market, entitling investors to rely on the presence of the securities just as they would rely on statements in a prospectus—is simply false." *Id.* at 1131. The Seventh Circuit instructed that on remand, the Eckstein plaintiffs' § 10(b) claim would hinge on proof of the "counterfactual" proposition that the defendants *would not* have met the $35 million minimum sales requirement if the prospectus had contained full disclosure. *Id.*

All this casts a threatening cloud over Count I, which does not allege a proper legal or factual theory of reliance or causation. The complaint does not plead actual reliance on the prospectuses[3] and does not plead a "fraud-on-the-market" as recognized by *Basic* as a basis for causation. The Prudential defendants have suggested that an open and developed market did not exist for these securities, and that suggestion, if true, could explain why plaintiffs pin their hopes on the "fraud-created-the-market" theory of *Shores*. In any event, even under the generous standard this court must employ in deciding dismissal motions, *see Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984), the court holds that Count I has failed to state a claim for violation of § 10(b) of the 1934 Act.

■ Although this court would not go so far as to require the specific pleading of facts showing an open and developed market, *see Greenberg v. Boettcher & Co.*, 755 F.Supp. 776, 782 (N.D.Ill.1991), we do hold that if plaintiffs advance a "fraud-on-the-market" causation theory akin to the "developed market" doctrine of *Basic*, they should at least plead that an open and developed market existed for the securities in question. The facts may not permit plaintiffs to do so. If so, and if plaintiffs do not rely on *Basic*, *Eckstein* teaches that they must plead (and ultimately prove) that if the Prudential defendants had disclosed the alleged kickback scheme, the Summit Funds securities would have been actually excluded from the market altogether, and not just that the disclosures

would have depressed the price severely. Plaintiffs may face "rough sledding" in this regard, if the Seventh Circuit is correct in its observation that "[f]ull disclosure of adverse information may lower the price, but it does not exclude the security from the market.... some markets specialize in penny stocks." *Eckstein*, 8 F.3d at 1131. But *Eckstein* forbids this court from equating a security's mere presence on the market with the plaintiff purchaser's reliance on the prospectus.

Accordingly, Count I will be dismissed without prejudice. If the facts permit, the plaintiffs should amend the complaint to plead reliance or causation appropriately.

### 2. "Bootstrapping" a Fiduciary Duty Claim

■ The court's application of *Eckstein* to this case renders unnecessary a detailed analysis of the Prudential defendants' argument that plaintiffs are improperly invoking the antifraud provisions of the federal securities laws to bring a claim that sounds in breach of fiduciary duty. The Prudential defendants correctly observe that to the extent plaintiffs' allegations could be characterized as implicating only the mismanagement of the limited partnerships, as opposed to the conduct of the offering and the concordant interest in full disclosure therein, the allegations may be actionable under state law of fiduciary duty, but not under § 10(b) of the 1934 Act. *See Santa Fe Indus. v. Green*, 430 U.S. 462, 478, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977); *Ray v. Karris*, 780 F.2d 636, 640

---

3. The complaint does allege oral misrepresentations by the defendants, but the Seventh Circuit has held that a securities seller's written disclosures trump any contrary oral statements. *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322 (7th Cir.1988). The court's review of the Prudential defendants' written disclosures, which the complaint incorporates by reference, indicates that the written disclosures clearly explained that the Summit Funds investments were not backed by the taxing power and full faith and credit of the municipalities issuing the bonds. These written statements must trump the alleged oral representations that the Summit Funds were "as safe as a municipal bond," in light of the Seventh Circuit's view that unless the written representations govern, "it is easy to claim: 'Despite what the written documents say, one of your agents told me something else.'" *Id.*

Plaintiffs may claim they never read the prospectuses. But given that the defendants previously had prepared and released the prospectuses under a statutory duty to disclose, the plaintiffs will not be heard to avoid the rule of *Acme* by burying their heads in the sand. The minimum step of obtaining and reading a prospectus is not so daunting a task as to erode the investor's statutory protection against fraud. *Cf. Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 528 (7th Cir.1985) ("we will not establish a legal rule under which investors must resort to the costly self-help approach of investigation on pain of losing the protection of the principal legal safeguard, the rule against fraud.... [but] [t]his is not to say that buyers of products (including securities) need not investigate what it is they are getting").

(7th Cir.1985); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 287–88 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). The court reads the complaint as broadly alleging that the defendants' misrepresentations harmed the plaintiffs as investors, aside from any damage that may have been done to the partnerships. Nonetheless, in light of the rationale for the court's dismissal of Count I without prejudice for failure to state a claim, the plaintiffs may wish to evaluate the fundamental nature of their claim. The facts may not permit them to plead a claim for securities fraud; their asserted injuries may have been caused not by fraud in the sale of the securities, but by breach of fiduciary duty in the management of the limited partnerships. If that is the case, plaintiffs should heed the Seventh Circuit's warning that a breach of fiduciary duty claim may not be bootstrapped into a federal securities action "by alleging that the disclosure philosophy of the statute obligates defendants to reveal either the culpability of their actions, or their impure motives for entering the allegedly improper transaction." *Panter*, 646 F.2d at 288.

## B. Standing

The dismissal of Count I without prejudice provides plaintiffs with an opportunity to remedy that count's problems with standing, as identified by the Prudential defendants.

■ Article III of the Constitution limits the power of federal courts to the resolution of "cases" and "controversies." U.S. Const. art. III; *Foster v. Center Township of LaPorte County*, 798 F.2d 237, 240–41 (7th Cir.1986). Plaintiffs have standing if they allege they sustained an injury that is fairly traceable to the defendant's allegedly unlawful conduct, and if the injury would be redressable by the requested relief. *See Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). In addition to this constitutionally imposed limitation, the concept of standing also embraces several prudential limits on the exercise of federal jurisdiction. *Id.; FMC Corp. v. Boesky*, 852 F.2d 981, 988 (7th Cir.1988). Plaintiffs ordinarily may not assert a "generalized grievance" shared in substantial measure by a large class of citizens; they must assert their own legal rights and interests and cannot rest a claim to relief on the legal rights or interests of third parties; and the complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional provision at issue. *Valley Forge Christian College v. Americans United For Separation of Church & State, Inc.*, 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982); *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In a securities action brought under § 10(b), a party has standing to sue only if his or her claimed injury is in connection with the purchase or sale of a security. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737–38, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975). This limitation on antifraud actions under the 1934 Act serves the Act's purpose of protecting investors without exposing corporations to expansive civil liability. *Davidson v. Belcor, Inc.*, 933 F.2d 603, 606 (7th Cir.1991) (citing *Blue Chip Stamps*, 421 U.S. at 739–45, 95 S.Ct. at 1927–30)).

■ The Prudential defendants note that ¶ 41 of Count I states that the count was brought on behalf of all plaintiffs or putative class plaintiffs who purchased interests in the Summit Funds after January 3, 1989, which is three years before the filing of this action. *See* Complaint at ¶ 41. Further, the complaint alleges that only one of the seven named plaintiffs, Andrew Gallopo, actually purchased an interest in the Summit Funds during that time period. *Id.* at ¶ 5(c). Four other plaintiffs (Richard Levine, Polly S. Gutman, Harley Kravitz and Todd Middleton; "the pre–1989 plaintiffs") are alleged to have purchased the securities before 1989, and the complaint does not specify when the remaining two plaintiffs (Jami Lynn Levy and Joel Levy; "the Levy plaintiffs") purchased. *Id.* at ¶ 5. The three-year time frame prior to the filing of the complaint is important, of course, because a § 10(b) lawsuit must be brought within three years of the offending purchase or sale transaction or within one year of discovery of the facts constituting the violation. *Lampf, Pleva, Lipkind, Prupis & Petrigrow v. Gilbertson*,

501 U.S. 350, 363–64, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991); 15 U.S.C. § 78i(e).

Plaintiffs assert that they did not discover the harms until 1991, but the issue raised here is not whether their claims are barred by limitations, but whether some of them lack standing to bring this action as pleaded in Count I. Count I does not purport to seek recovery on behalf of purchasers who bought before 1989 but discovered their harms within a year of filing suit. Count I explicitly seeks relief "on behalf of all plaintiffs and members of the plaintiff class who purchased interests in the Summit Funds within three years before the date on which this action was filed." Complaint at ¶ 41. Only plaintiff Gallopo meets that specific criterion. Therefore all other plaintiffs do not appear to have standing to bring the specific claim asserted in Count I. Because the court is dismissing Count I on other grounds, plaintiffs will have an opportunity to file an amended complaint advancing claims which all plaintiffs have standing to raise.

## C. Scienter

 The Prudential defendants' argument that plaintiffs have inadequately pleaded scienter rests roughly on the same grounds as their contentions with respect to Rule 9(b). The defendants cite *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir.1990), *cert. denied*, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991), along with *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990), and *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 497 (7th Cir.1986), for the proposition that in cases where scienter is a required element, Rule 9(b) requires the complaint to allege facts supporting an inference that the defendants acted with the requisite knowledge.

As stated earlier in this opinion, Rule 9(b) requires only a general averment of knowledge, and the plaintiffs have done that. The cases cited by the Prudential defendants all involved the scienter requirement for complaints charging § 10(b) aider and abettor liability. By contrast, the instant complaint alleges that the Prudential defendants were among a group of primary violators. Whereas an aiding and abetting case naturally implicates the question of why the defendant would "throw in his lot" with the primary violators, *see Barker*, 797 F.2d at 497, that question does not automatically arise in cases involving only primary violators. While the court doubts that *DiLeo, Robin* and *Barker* require plaintiffs in § 10(b) aiding and abetting cases to plead knowledge with more particularity than is required by Rule 9(b), the rationale of those cases does not apply to the instant case in any event. In this case, Count I alleges that the Prudential defendants played a central role in fraudulently organizing, operating and selling interests in the limited partnerships. The gist of those allegations provides a sufficient basis to infer scienter, given that Rule 9(b) requires only general allegations of knowledge, intent or malice in fraud cases.

## III. Count II: The RICO Claim

Count II is brought under the Racketeer Influenced and Corrupt Organization ("RICO") statute, 18 U.S.C. § 1962(c). Plaintiffs allege that all of the defendants violated RICO by their participation in the purported scheme to operate the Summit Funds to generate kickbacks and for other fraudulent purposes. To plead a violation of § 1962(c), a complaint must allege the defendants' conduct of an enterprise through a pattern of racketeering activity. *McDonald v. Schencker*, 18 F.3d 491, 494 (7th Cir.1994). Plaintiffs have insufficiently pleaded the predicate acts necessary to show a pattern of racketeering, and Count II must be dismissed without prejudice.

## A. Inadequacy of the Alleged Pattern of Racketeering

 A RICO plaintiff must allege at least two predicate acts of racketeering committed within a 10–year period. 18 U.S.C. § 1961(5). These predicate acts may consist of offenses indictable under any of several listed criminal statutes, including mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343, as well as securities fraud, 18 U.S.C. §§ 1961(1)(A), 1961(1)(D). In addition, the plaintiff must show that the predicate acts

are related, and that they amount to or pose a threat of continued criminal activity. *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900–01, 106 L.Ed.2d 195 (1989).

### 1. Predicate Acts

Count II alleges securities fraud, wire fraud and mail fraud as predicate acts. But where allegations of securities fraud are insufficient to establish liability under the federal securities laws, those allegations cannot be a basis for RICO liability. *See Forkin v. Rooney Pace, Inc.*, 804 F.2d 1047, 1051 (8th Cir.1986); *Berg v. First Am. Bankshares*, 796 F.2d 489, 502 (D.C.Cir.1986); *LaRoe v. Elms Sec. Corp.*, 700 F.Supp. 688, 695 (S.D.N.Y.1988). The question then becomes whether the complaint's mail and wire fraud allegations are sufficient to support the RICO claim.

In *Forkin*, the Eighth Circuit held that the insufficiency of the securities fraud claims in a RICO action warranted dismissal of the RICO claim, even where mail and wire fraud also were alleged as predicate acts. *Forkin*, 804 F.2d at 1051. In an opinion written by Judge Heaney, the court stated that "our finding with respect to the securities law claims renders the RICO claims insufficient as a matter of law because the appellants' allegations of racketeering activity are predicated on the same conduct as the securities fraud claims." *Id.*

But in *LaRoe*, the district court went on to evaluate whether the mail and wire fraud claims were adequately pleaded as RICO predicate acts, even after the dismissal of the securities law claims. *LaRoe*, 700 F.Supp. at 695–96. The *LaRoe* court ultimately dismissed the RICO claim because only one of the mail and wire fraud allegations was pleaded with adequate particularity. *Id. LaRoe* is significant for its finding that one of the mail fraud allegations was adequately pleaded as a RICO predicate act in furtherance of an "overall scheme to defraud plaintiffs of their money," *id.* at 695, even though the same overall securities fraud scheme did not meet the particularity requirement of Rule 9(b) as pleaded in that case.

This court is unaware of any Seventh Circuit precedent squarely on point, although our appeals court looks unfavorably upon "relying on many instances of mail and wire fraud to form a pattern." *Vicom*, 20 F.3d at 781 (quoting *Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir.1990)). The Seventh Circuit also has stated that the sheer number of mail and wire fraud offenses takes on a lesser significance because the number of such acts may only be tangentially related to the underlying fraud. *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1278 (7th Cir.1989). Nonetheless, this court is reluctant to hold that mail or wire fraud in the instant case would require pleading of the technical elements of SEC Rule 10b–5. For example, the pleading of mail fraud as a RICO predicate act requires only that (1) the defendant has participated in a scheme to defraud, and (2) the defendant has mailed or has knowingly caused to be mailed a letter or other matter for the purpose of executing the scheme. *McDonald v. Schencker*, 18 F.3d 491, 494 (7th Cir.1994). Given this court's finding that plaintiffs have satisfied the particularity requirement of Rule 9(b) as to the overall scheme alleged in the complaint, we will not dismiss the mail and wire fraud allegations out of hand solely by virtue of the dismissal of the securities count.

The next question concerns the sufficiency of the mail and wire fraud acts. Again, these can be predicate acts only if they were done in execution of the fraudulent scheme. *Id.* But the complaint does not describe the mailings and wire communications with enough specificity for this court to conclude that they were in execution of the scheme. Concerning mail fraud, the complaint only makes vague reference to (1) "thousands" of subscription documents mailed to investors; (2) other correspondence and statements; and (3) the negotiation of financing agreements. These allegations do not indicate what connection these communications had to the fraudulent scheme. With respect to quarterly statements mailed to investors in 1987, 1988 and 1989, the complaint makes the bald assertion that these were mailed "in order to execute the scheme," but it does not say how. Complaint at ¶¶ 54, 1–40. None of the allegedly fraudulent mailings, as pleaded in the

complaint, gives the court a basis for inferring that the mailings were in execution of the scheme. The same is true of the allegedly fraudulent wire communications. The complaint cites no specific telephone conversation, parties to a conversation, date or time of a conversation, or any other specific use of the wires in furtherance of the alleged fraudulent scheme. Allegations that wire fraud occurred during the negotiation of unspecified financing agreements between the defendants and unnamed developers are insufficient.

Accordingly, plaintiffs have not sufficiently pleaded two racketeering acts within a 10-year period, as is required to make out a "pattern of racketeering" under 18 U.S.C. § 1961(5). Count II will be dismissed without prejudice.

### 2. Relatedness and Continuity

The Prudential defendants have not raised relatedness or continuity as grounds for dismissal, but if plaintiffs replead their complaint, they should be careful to plead these two matters properly, especially the latter. Continuity, for purposes of divining a "pattern of racketeering activity" under RICO, "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat or repetition." *Vicom*, 20 F.3d at 779 (quoting *H.J., Inc.*, 492 U.S. at 241, 109 S.Ct. at 2901)).

Closed-ended continuity turns on whether the predicate acts spanned a substantial period of time, along with factors including the number and variety of the predicate acts, the number of victims involved, the number of schemes involved, and whether the predicate acts inflicted distinct injuries. *Vicom*, 20 F.3d at 780–82; *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir.1986). In this case, the period of time encompassed by the alleged kickback scheme is not clear from the complaint. The complaint states that the limited partnerships were formed between 1985 and 1987, and that plaintiffs bought their interests between in 1986 and 1989. But the complaint does not specify the time of many of the acts that are alleged to have rendered the Summit Funds fraudulent. The complaint also does not provide the court with a basis for deciding that the scheme would meet RICO's closed-end continuity requirement based on application of the *Morgan* factors, recited above. Alternatively, "open-ended" continuity may be established even if the predicate acts spanned a relatively short period of time, if plaintiffs can show (1) a specific threat of repetition exists; (2) the predicate acts are a regular way of conducting on ongoing legitimate business; or (3) the predicate acts can be attributed to a defendant who is operating as a part of a long-term association that exists for criminal purposes. *Vicom*, 20 F.3d at 782. The complaint in this case does not provide the court with a basis for believing that plaintiffs could satisfy continuity on any of the three alternative grounds. Allegations that defendants pose a continuing threat because they previously "sponsored many real estate investment programs," Complaint at ¶ 49, without particularized allegations of how such programs were fraudulent, are irrelevant. The same may be said of allegations to the effect that each of the Summit Funds was structured or organized in the same manner; this does not necessarily indicate a danger that the Funds or other limited partnerships will be operated fraudulently in the future. Bald assertions that a scheme is "ongoing," or that a defendant "continues his racketeering activities," are insufficient to establish continuity. *Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344, 352 (7th Cir.1992); *Vicom*, 20 F.3d at 783. The court is uncertain whether the alleged scheme had a natural ending point or a clear and terminable goal, a fact which would weigh against finding a specific threat of repetition. *Id.* at 782–83. The court also is unpersuaded that the complaint sufficiently alleges that the predicate acts themselves, as opposed to the Prudential defendants' alleged scheme to defraud or their general formation of limited partnerships, were the Prudential defendants' regular way of doing business. *See id.* at 783–84. The third means of showing open-ended continuity does not appear to apply to this case.

Since the Supreme Court explained the closed-ended and open-ended forms of continuity in its 1989 *H.J.* decision, this court is aware of only one Seventh Circuit decision holding that sufficient continuity was established to meet RICO's "pattern" requirement. *See Shields Enter., Inc. v. First Chicago Corp.*, 975 F.2d 1290 (7th Cir.1992). *Vicom*, and many of the cases cited within it, demonstrate the great difficulty involved in pleading continuity properly since the *H.J.* case. Plaintiffs should take a long look at those cases if they choose to file an amended complaint alleging violations of RICO.

### 3. Proximate Causation

The Prudential defendants argue that Count II does not sufficiently allege proximate causation because the alleged kickback scheme directly harmed only the third-party developers, whose injury in turn caused plaintiffs' injuries when development projects went into default or did not generate revenue. The requirement of proximate cause does limit a plaintiff's standing to recover under RICO. *Holmes v. Securities Investor Protection Corp.*, — U.S. —, ——–——, 112 S.Ct. 1311, 1319–21, 117 L.Ed.2d 532 (1992); *Schiffels*, 978 F.2d at 350. For example, if a RICO conspiracy of arsonists struck a plaintiff's automobile while one of the conspirators was driving to buy gasoline to start a fire, the plaintiff could establish but-for causation, but the doctrine of proximate cause would bar a RICO suit. *Id.* In the instant case, however, the alleged injury to the plaintiffs' partnership interests is not so remote from the alleged kickback scheme. The scheme is alleged to have been aimed at both the developers *and* the limited partnerships. As the scheme is alleged, injury to the limited partnerships was a natural and probable consequence of the scheme's operation. The element of proximate cause is therefore sufficiently pleaded.

### 4. Enterprise

RICO requires plaintiffs to allege that defendants conducted an "enterprise," defined as an "association in fact," or an ongoing "structure" of persons associated through time, joined in purpose, and orga-

nized in a manner amenable to hierarchical decision-making. *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir.1990). An enterprise must exist separate and apart from the pattern of racketeering activity alleged in the RICO complaint, because the enterprise is "defined by what it is, not what it does." *Id.* After reading plaintiffs' response brief, the court suspects that plaintiffs believe they may define the enterprise by what it does, or by pointing to the alleged pattern of racketeering alone. Plaintiff's Consolidated Response to Motions to Dismiss the First Amended Class Action Complaint ("Response"), at 40. Upon close examination, the complaint does seem to outline a rough hierarchy of general partners (the Related Companies and Prudential–Bache Properties), a selling agent (Prudential–Bache Securities) and construction consultants (the Tandy defendants) in the alleged scheme to defraud. Complaint at ¶¶ 16, 22. Plaintiffs also have included allegations that the enterprise existed separate and apart from the racketeering scheme. *Id.* at ¶ 51. Count II thus appears to plead an enterprise adequately.

## B. Lack of Standing/Derivative Claims

Even if the complaint had properly pleaded a pattern of racketeering activity, its contradictory allegations of individual and derivative injury probably would not withstand analysis.

### 1. Standing To Sue Individually

The Prudential defendants argue that plaintiffs, as limited partners, lack standing to bring Count II because the RICO claim is derivative. On one level, Count II alleges that the individual plaintiffs "sustained injuries to their property in consequence of the defendants' racketeering activities, in that the value of their interests in the Funds has been greatly diminished, the income generated to investors through the Funds has been steadily reduced, and the opportunity to resell their interests has been diminished." Complaint at ¶ 55. On another level, Count II incorporates the complaint's derivative allegations against the defendants. *Id.* at ¶¶ 47, 15.

A RICO suit may be brought by a person[4] who is "injured in his business or property by reason of a violation" of the RICO statute. 18 U.S.C. § 1964(c). Shareholders, however, have no standing to bring RICO lawsuits in an individual capacity for claims that in reality are derivative: If the shareholder's injury resulted directly from an injury to the corporation, but only indirectly from the harm the wrongdoer wreaked upon the corporation, the RICO claim belongs to the corporation, and not the shareholder. *See Sears v. Likens,* 912 F.2d 889, 892 (7th Cir.1990); *Flynn v. Merrick,* 881 F.2d 446, 449 (7th Cir.1989).

> Good reasons account for the enduring distinction between direct and derivative injury. When the injury is derivative, recovery by the indirectly injured person is a form of double counting. "Corporation" is but a collective noun for real people.... A blow that costs "the firm" $100 injures one or more of those persons. If, however, we allow the corporation to litigate in its own name and collect the whole sum (as we do), we must exclude attempts by the participants in the venture to recover for their individual injuries.

*Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1335–36 (7th Cir.1989). The same reasoning applies to limited partnerships, and federal courts have applied the foregoing rule to them as well. *See Whalen v. Carter,* 954 F.2d 1087, 1093 (5th Cir.1992); *Dayton Monetary Assocs. v. Donaldson, Lufkin & Jenrette Sec. Corp.,* No. 91 Civ. 2050, 1993 WL 410503, at *1 (S.D.N.Y. Oct. 14, 1993); *Attick v. Valeria Assocs., L.P.,* 835 F.Supp. 103, 110–11 (S.D.N.Y.1992); *Ball v. Field,* No. 90 C 4383, 1992 WL 57187, at *8 (N.D.Ill. March 19, 1992). Courts do, however, allow shareholders to sue as individuals where they allege injuries separate and distinct from those of other shareholders. *Flynn,* 881 F.2d at 449; *Twohy v. First Nat'l Bank of Chicago,* 758 F.2d 1185, 1194 (7th Cir.1985). Presumably an injury of a different type[5] than that suffered by other shareholders would qualify as a direct injury, rather than the sort of indirect injury involved in investment losses that result from harms to the corporation or partnership.

As pleaded, Count II does not make clear whether plaintiffs assert the RICO claim derivatively or individually. In their response brief, plaintiffs suggest that Count II's allegations "go beyond mismanagement" and support a securities fraud claim that was personal to the plaintiffs. Response at 36–38. The Prudential defendants point out that plaintiffs have not backed away from Count II's characterization of the claimed RICO injury as "*[p]laintiffs* [having] sustained injuries ...." Complaint at ¶ 55 (emphasis added). Plaintiffs thus appear to be operating under the assumption that they may allege the RICO injuries in an individual capacity. Yet they have not alleged any injury of a type that would be separate and distinct from that suffered by all limited partners in the Summit Funds. Therefore, the contentions of the Prudential defendants are well taken. Count II does not allege that plaintiffs' asserted injuries stem directly from the alleged kickback scheme. Therefore Count II does not state a claim under which the plaintiffs may recover as individual limited partners. As indirectly injured parties, plaintiffs must look to the recovery of the directly injured party, and not the wrongdoer, for relief. *Carter v. Berger,* 777 F.2d 1173, 1176 (7th Cir.1985).

---

4. "Person" is defined in the statute as any individual or entity capable of holding a legal or beneficial interest in property. 18 U.S.C. § 1961(3).

5. We take this exception to mean that an individual shareholder may have standing to sue if his or her injury is of a different type or nature than the injury to other shareholders. In *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271 (7th Cir.1989), for example, the plaintiff fuel suppliers made a RICO claim against a bankrupt petroleum wholesaler. *Id.* at 1272. The alleged scheme involved the defendant's fraudulent purchase of the fuel on credit and diversion of the fuel and its proceeds, such that it could not pay the debt to the suppliers. *Id.* at 1279. The Seventh Circuit noted that ordinarily a RICO claim on behalf of injured creditors could be brought only by the trustee in bankruptcy, but the court held that the fuel suppliers had standing because they were hurt not only by the defendant's depletion of its assets, but also by its fraudulent taking of a large amount of fuel from the plaintiffs. *Id.* at 1280.

## 2. Plaintiffs' Derivative Allegations

The derivative action provides plaintiffs with a tool to accomplish exactly that.[6] Mindful of the need to draw all inferences from the complaint in the plaintiffs' favor on this motion to dismiss, *see Gillman v. Burlington N. R.R. Co.*, 878 F.2d 1020, 1022 (7th Cir.1989), the court reads the ambiguous Count II as pleading a derivative claim with respect to the alleged RICO violations. The court then must analyze the sufficiency of the derivative allegations under Fed.R.Civ.P. 23.1, which reads:

> In a derivative action brought by one or more shareholders of members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may be properly asserted by it, the complaint shall be verified and shall allege (1) that the plaintiff was a shareholder or member at the time of the transaction of which the plaintiff complains or that the plaintiff's share or membership thereafter devolved on the plaintiff by operation of law, and (2) that the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort. The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association....

Fed.R.Civ.P. 23.1. The Prudential defendants attack plaintiffs' derivative allegations in two respects as insufficiently pleading the futility of demand on the general partners, and as failing to include proper verifications.

### a. Futility of Demand

■■■■ As to the futility of demand, Rule 23.1 requires plaintiffs to allege with particularity the reasons why no demand to bring this RICO action was made upon the general partners of the Summit Funds. Because the Funds were organized in Delaware, the court will look to Delaware law for the substantive rule governing demand futility. *Cf. Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97–107, 111 S.Ct. 1711, 1717–22, 114 L.Ed.2d 152 (1991) (holding that demand futility doctrine is substantive, thus rule of decision concerning demand in derivative action brought under federal Investment Company Act of 1940 should be supplied by law of state of incorporation). Under Delaware law, demand may be excused if the plaintiff alleges facts creating a reasonable doubt that the directors are disinterested in the challenged transaction and that the transaction otherwise was a valid exercise of business judgment. *Aronson v. Lewis*, 473 A.2d 805, 814 (Del.1984); *see also Kamen v. Kemper Fin. Servs., Inc.*, 939 F.2d 458, 461 (7th Cir.) ("The prevailing contemporary view is that demand is necessary if the directors are disinterested—and because of the business judgment rule directors may be financially disinterested even if they took part in the acts of which the plaintiff complains."), *cert. denied,* —— U.S. ——, 112 S.Ct. 454, 116 L.Ed.2d 471 (1991). In short, plaintiffs must allege, with particularity, facts showing a conflict affecting the general partners' conduct which raises a reasonable question as to their disinterestedness, independence or business judgment. *Litman v. Prudential–Bache Properties, Inc.*, CIV. A. No. 12137, 1993 WL 5922, at *3 (Del. Ch. Jan. 4, 1993).

■■■■ To this end, plaintiffs allege that "[t]he defendants in this case include the general partners and their affiliates who con-

---

**6.** A limited partner's right to bring a derivative action is well recognized, although the question usually has arisen in the context of state statutes modeled after the Uniform Limited Partnership Act. *See e.g., Lerman v. Tenney*, 425 F.2d 236, 237 (2d Cir.1970) (New York law); *Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59, 67 (2d Cir.1983) (Pennsylvania law); *Allright Missouri, Inc. v. Billeter*, 829 F.2d 631, 635 (8th Cir.1987) (Missouri law); *Lenz v. Associated Inns and Restaurants Co.*, 833 F.Supp. 362, 378 (S.D.N.Y.1993) (Oklahoma law). Illinois law is in accord. 805 ILCS 210/1001.

trol the Funds.... [T]he directors and controlling entities of the Funds could not properly maintain this action against themselves or their affiliates, [and] could not fairly or independently decide whether it would be in the Funds' or the shareholders' interest to maintain this action...." Complaint at ¶ 15(d). The complaint also alleges that demand would be futile because the defendants "have done nothing" during the pendency of the lawsuit, and because some of the Prudential defendants are subject to criminal and regulatory investigations and thus have an interest in seeing that plaintiffs' fraud claims are not prosecuted.

These allegations are insufficient to show that the general partners were not disinterested. Without deciding whether the decision in *Litman* is res judicata,[7] the court notes that plaintiffs cannot establish demand futility by alleging that the general partners cannot be expected to sue themselves. *Aronson*, 473 A.2d at 818; *Litman*, 1993 WL 5922, at *4. Nor can they establish demand futility by alleging that the board has not acted so far in the absence of a demand, or by stating in conclusory manner that the regulatory or criminal investigations necessarily will interfere with the partners' exercise of business judgment as to the action sought by plaintiffs. The complaint alleges that the investigations involve the promotional sales practices of "some" of the Prudential defendants or their "affiliates," Complaint at ¶ 15(f), but it states nothing further in support of the proposition that these investigations would have a particular effect on the management decisions of the Summit Funds' general partners. Such a vague allegation invites the court to hold that demand would

be futile whenever the corporation or partnership is the subject of even a routine regulatory or criminal investigation.

Instead, the plaintiffs must particularly show *interest*, and here is where the complaint's lack of specificity comes back to haunt the plaintiffs. The derivative allegations, and the complaint as a whole, do not set out how the controlling partners actually received any profits from the kickback scheme. The complaint alleges the receipt of management fees for certain real estate projects, but it does not allege that the fees were excessive or otherwise of such a nature as to pose a real conflict of interest for the general partners. *See Litman*, 1993 WL 5922, at *3. In sum, the derivative allegations do not cite any particular reason why the directors are financially interested or why their declining to bring this lawsuit would be an invalid exercise of business judgment. On these grounds, aside from other flaws in the plaintiffs' theory of derivative injury,[8] the RICO allegations would fail as a derivative claim. Dismissal of Count II will be without prejudice. An amended pleading may be filed, if the facts permit, alleging more particularly why demand would have been futile under Delaware law, or that demand was made and that the refusal to sue was not a valid exercise of business judgment.

**b. Verification**

■ With respect to verification, plaintiffs initially filed their complaint on March 31, 1993, without verifications. In August 1993, plaintiffs filed unnotarized verifications by plaintiffs Gutman, Gallopo, Levine and

7. The *Litman* court held derivative allegations insufficient in a case filed against the Prudential defendants by a different set of plaintiffs, who purchased in the initial offer of the Summit Fund LPI securities. Although the case involved different named plaintiffs, the derivative action was brought on behalf of LPI, as was this action with respect to LPI investors Gallopo, Kravetz and Levine.

8. The derivative allegations raise serious questions about whether plaintiffs understand the nature of a derivative suit or are prepared to pursue their claims in a derivative capacity. Specifically, the derivative allegations state that "[m]any or all of these claims are personal in

nature which arise from injuries to the shareholders themselves as opposed to the Funds," Complaint at ¶ 15(a), and "[t]he injuries complained of are distinct from the injuries to the Funds." *Id.* at ¶ 15(c). The whole concept of a derivative suit, as explained by Rule 23.1, embodies an action on behalf of the firm to redress an injury to the firm—not a "personal" injury to an individual limited partner or shareholder, and not to redress an injury "distinct" from the injury to the firm. As the court stated earlier in this opinion, plaintiffs do not have standing to bring individual RICO claims for indirect injuries they suffered as a result of the injury to the partnership.

Middleton. The verifications were attached to a copy of the complaint and affirmed the truth of "the foregoing"; they did not state that any signator actually had read the complaint. Middleton's verification contains the caveat that the complaint marks "the first time I have learned the details of this case." No verifications have been filed by the Levy plaintiffs or by plaintiff Kravetz. This court has previously held that Rule 23.1's verification requirement is to ensure that the court will not be used for "strike suits" and that the plaintiffs have investigated the charges and found them to be of substance. *Porte v. Home Fed. Sav. & Loan Ass'n*, 409 F.Supp. 752, 754 (N.D.Ill.1976); *see also Halsted Video, Inc. v. Guttillo*, 115 F.R.D. 177, 180 (N.D.Ill.1987).

With these purposes in mind, and in consideration of the fact that plaintiffs are being given leave to amend on other grounds, the court holds that the derivative complaint in Count II contains insufficient verification. If plaintiffs file an amended complaint containing derivative allegations, notarized verifications should be on file as to all plaintiffs. They should state that the signator has read the complaint and that he or she declares the complaint to be true, on penalty of perjury. Middleton's verification is especially troublesome, in that it implies that Middleton did no investigation himself but merely relied on the work product of counsel. Plaintiffs should file the requisite verifications along with any amended complaint.

## C. Limitations

 The Prudential defendants contend that as to all named plaintiffs who purchased their securities prior to January 3, 1988, Count II is time-barred by the four-year statute of limitations applicable in RICO cases. *See Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). That period began to run when the plaintiffs discovered or should have discovered their injuries, even if they had not yet discovered

the alleged pattern of racketeering, unless circumstances support the application of equitable tolling. *Bontkowski v. First Nat'l Bank of Cicero*, 998 F.2d 459, 461 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993); *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464–65 (7th Cir.1992).[9] The Seventh Circuit's distinction between discovering the injury and discovering the pattern of racketeering does not precisely clarify the meaning of "injury" in this context. The *McCool* court held that the limitations period began to run "once there was a RICO violation and the plaintiffs knew or should have known that they were injured." *McCool*, 972 F.2d at 1464. But we think that at minimum, knowledge of "injury" includes notice of facts causing plaintiffs to conclude not only that their interests had declined in value, but that the decline was the result of some sort of fraud. The value of investments may rise and decline rapidly and unpredictably under ordinary market conditions. To say that any sharp decline in value would automatically trigger the RICO limitations period would construe the term "injury" too expansively. But if such a drop in value were coupled with the plaintiff's awareness of facts indicating that the decline occurred because the investment simply is not what it was represented to be, the RICO statute arguably would begin to run, even though the potential plaintiff still is unaware of the precise cause of action or the particular acts that formed a pattern of racketeering. In a recent non-RICO limitations case, the Seventh Circuit explained knowledge of an injury as "not only knowledge that one has been injured but also knowledge that one may have been injured by someone who conceivably might be legally liable. Without knowing that, the plaintiff would have no reason to begin to investigate the possibility that his legal rights have been infringed." *Winskunas v. Birnbaum*, 23 F.3d 1264, 1266–67 (7th Cir.1994) (citation omitted). Investors need not know how or by whom they were defrauded for the statute to begin to

---

9. Plaintiffs argue that the RICO limitations period begins with the "last alleged act of racketeering activity," Response at 35, and then state that it does not begin to run "until the plaintiff discovered or should have discovered the racketeer-

ing injury." *Id.* at 36. These two notions differ fundamentally. As *McCool* and *Bontkowski* make clear, the latter "discovery" rule is the one the Seventh Circuit requires this court to follow.

run. They need only have notice of facts indicating a probability that they were defrauded in some manner.

 Under the foregoing standard, Count II adequately pleads compliance with the RICO statute of limitations. Only plaintiffs Gutman and Gallopo are alleged to have purchased within the RICO limitations period. Complaint at ¶ 5. As to the remaining five plaintiffs, the complaint avers that the defendants' fraudulent concealment prevented all of the plaintiffs from discovering their injuries until 1991, upon investigation by their counsel. *Id.* at ¶ 38–40. At that point in 1991, what the plaintiffs discovered was the "existence of the defendants' fraudulent scheme," according to the complaint. *Id.* at ¶ 38. Prior to 1991, according to the complaint, the plaintiffs "had no idea that such misconduct was occurring or was the reason why the Funds were not performing better." *Id.* Accordingly, even if plaintiffs discovered the decline in the value of their partnerships sometime earlier, they have alleged that they did not catch wind of the alleged fraud until 1991, and that falls within the limitations period.

### IV. State Law Claims

With the dismissal of the federal counts, the court also will enter a dismissal of the state counts without prejudice. 28 U.S.C. § 1367. In the interest of judicial economy, the court will not analyze these claims in detail. But in the event that plaintiffs refile, they should be aware of a number of substantial issues raised by the Prudential defendants in their memorandum and reply brief. These issues concern whether plaintiffs have standing to bring actions under the blue-sky laws of states in which they did not reside or did not purchase the securities; whether the causation problems in the federal securities fraud count similarly defeat the state securities fraud and common law fraud counts; whether the flaws in the derivative allegations may be remedied sufficiently to support the derivative state law breach of fiduciary duty claims; and whether, as the Prudential defendants suggest, the economic loss doctrine applies to bar plaintiffs' negligence claims except under a theory of negli-

gent misrepresentation requiring pleading and proof that defendants were in the business of supplying information and provided the information for the guidance of others in their business transactions. *See Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.,* 159 Ill.2d 137, 201 Ill. Dec. 71, 636 N.E.2d 503 (Ill.1994); *Moorman Mfg. Co. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). Plaintiffs obviously should not proceed with any claims not supported in fact and law.

### CONCLUSION

For the foregoing reasons, the Prudential defendants' motion to dismiss the first amended complaint is granted without prejudice. Plaintiffs are given until June 30, 1994, to file an amended complaint.